**BETHLEHEM STEEL CORP., Plaintiff,**

v.

**UNITED STATES, Defendant**

and

**Highveld Steel and Vandium Corp.,
Defendant-Intervenor.**

Court No. 82–10–01369.

United States Court of
International Trade.

June 8, 1984.

1238

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director Commercial Litigation Branch, Washington, D.C. (Velta A. Melnbrencis, Asst. Director, New York City, Francis J. Sailer and A. David Lafer, Washington, D.C., attorneys), for defendant.

Law Offices of Eugene L. Stewart, Washington, D.C. (Eugene L. Stewart, Terence P. Stewart and Paul W. Jameson, Washington, D.C.) special counsel and Law Department Bethlehem Steel Corp. (Curtis H. Barnette, General Counsel, Meredith Hemphill, Jr., Asst. General Counsel, Bethlehem, Pa., Laird D. Patterson, General Atty., Washington, D.C., and Roger W. Robinson, General Atty., Bethlehem, Pa.), for plaintiff.

Busby, Rehm & Leonard, Washington, D.C. (David Busby, Washington, D.C., of counsel), for defendant-intervenor.

Busby, Rehm & Leonard, Washington, D.C. (John B. Rehm, Washington, D.C., of counsel), for amicus curiae Hoesch Werke AG.

Steptoe & Johnson, Washington, D.C. (Michael Sandler and Alice L. Mattice, Washington, D.C., of counsel), for amicus curiae British Steel Corp.

Windels, Marx, Davies & Ives, New York City (Pierre F. de Ravel d'Esclapon, New York City, of counsel), for amicus curiae AG der Dillinger Huttenwerke and SACILOR.

Sharrets, Paley, Carter & Blauvelt, Washington, D.C. (Peter O. Suchman, Washington, D.C., of counsel), for amicus curiae Hoogovens Groep BV.

Robert M. Gottschalk, New York City (Richard E. Hull, Baltimore, Md., of counsel), for amicus curiae Forges de Clabecq., S.A.

Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C. (Stephen L. Gibson, Washington, D.C., of counsel), for amicus curiae Stahlwerke Peine-Salzgitter AG.

Mudge, Rose, Guthrie & Alexander, New York City (William N. Walker, New York City, of counsel), for amicus curiae Usinor.

Arter, Hadden & Hemmendinger, Washington, D.C. (William H. Barringer, Christopher Dunn and Arthur J. Lafave, III, Washington, D.C., of counsel), for amici curiae Companhia Siderurgica Paulista and Usina Siderurgicas De Minas Gerais.

WATSON, Judge:

This action is a judicial review of the final determination made by the International Trade Administration of the Department of Commerce (ITA) in a countervailing duty investigation of certain steel products from South Africa. This opinion deals with the phase of the determination in which the ITA determined that an income tax deduction allowed for the expenses of employee training programs conducted by the South African Iron and Steel Industrial

Corporation (ISCOR) and the Highveld Steel and Vanadium Corporation (Highveld) was not a bounty or grant. 47 Fed.Reg. 39379, 39381–82 (Sept. 7, 1982).

The practice at issue was one in which companies (whose employee training programs were certified by the South African Department of Manpower) were allowed to deduct 200 percent of the expenses of the training program from their taxable income. The ITA found that this practice was not a bounty or grant because of "the general availability of this tax benefit." 47 Fed.Reg. 39382. The ITA found that all qualified training programs were available to all companies and industries and they were not restricted to certain sectors of the economy or to exporters. It stated that "Our interpretation of the Act and past practice is that generally available benefits are not bounties or grants." 47 Fed.Reg. 39383.

The ITA explained the rationale of its decision in greater detail in Appendix 4 of its carbon steel products determinations (of which this determination was one) 47 Fed. Reg. at 39328. It read Section 771(5) of the Trade Agreements Act (19 U.S.C. § 1677(5)) as limiting domestic subsidies to those which are given to only *one* company or industry, or to a *limited* group of companies or industries, or to companies or industries in a *limited* region or regions of a country. It stated that Congress did not

intend to require the assessment of countervailing duties for programs which benefitted *all* industries. It saw support for this conclusion in Congressional intent that the term "subsidy" be given the same meaning as "bounty or grant" and stated that generally available programs had never been considered to give rise to a bounty or grant. In this opinion, the Court affirms the ITA determination solely on the ground that the practice in question was a tax law, and tax laws are not subsidies to the taxpayer if their terms are generally available. The Court rejects the broader rationale that, as a rule, generally available benefits are not subsidies.

At the outset, a short discussion of the particular provisions in the law governing this action may serve to avoid confusion. South Africa is not a "country under the Agreement," within the meaning of section 701(b) of the Trade Agreements Act of 1979 (19 U.S.C. § 1671(b)).[1] The main consequence is that the assessment of countervailing duties on its products does not require an injury determination as a basis for the assessment of those duties. For this purpose, the law expressed in 19 U.S.C. § 1303 governs. That provision is a direct descendant of the original countervailing duty laws in that, aside from not requiring an injury determination, it continues to refer to the practice which warrants assessment of duty as "any bounty or grant."[2]

---

1. 19 U.S.C. § 1671.

. . . . . .

(b) **Country under the Agreement.** For purposes of this subtitle [19 U.S.C. §§ 1671 et seq.], the term "country under the Agreement" means a country—
(1) between the United States and which the Agreement on Subsidies and Countervailing Measures applies, as determined under section 2(b) of the Trade Agreements Act of 1979 [19 U.S.C. § 2503(b)],
(2) which has assumed obligations with respect to the United States which are substantially equivalent to obligations under the Agreement, as determined by the President, or
(3) with respect to which the President determines that—
(A) there is an agreement in effect between the United States and that country which—
(i) was in force on June 19, 1979, and

(ii) requires unconditional most-favored-nation treatment with respect to articles imported into the United States,
(B) the General Agreement on Tariffs and Trade does not apply between the United States and that country, and
(C) the agreement described in subparagraph (a) does not expressly permit—
(i) actions required or permitted by the General Agreement on Tariffs and Trade, or required by the Congress, or
(ii) nondiscriminatory prohibitions or restrictions on importation which are designed to prevent deceptive or unfair practices.

2. 19 U.S.C. § 1303
* * * * * *

**Countervailing duties**
(a) **Levy of countervailing duties.** (1) Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 701(b) of this Act

The Trade Agreements Act of 1979 uses the term "subsidies" to describe the same practices. The primary purpose of the definition of subsidy in section 771(5) of the Act (19 U.S.C. § 1677(5)) is to make it plain that the term "subsidy" has the same meaning as the term "bounty or grant" and that there is a complete harmony and continuity between the two provisions. The Trade Agreements Act of 1979 then goes on to give, for the first time, specific examples of subsidies, the second group of which, consisting of certain specified domestic subsidies, is the focus of attention in this dispute. The entire provision reads as follows:

(5) Subsidy. The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 303 of this Act [19 U.S.C. § 1303], and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs of expenses of manufacture, production, or distribution.

It should be clear that the structure of this provision indicates that it is not *adding* to the old terms by example, but merely *illustrating* by example. The old terms already include export subsidies. See, *Downs v. United States*, 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903); *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). These are now illustrated by reference to the list contained in Annex A to the Agreement on Interpretation and Application of Articles VI, XVI, and XXIII of the General Agreement on Tariffs and Trade. The old terms already included domestic subsidies. See, *ASG Industries Inc. v. United States*, 82 Cust.Ct. 107, C.D. 4794, 467 F.Supp. 1200 (1979). Domestic subsidies are now illustrated by examples.

From a structural standpoint, the defendants are making use of the prefatory material to an expressly limited set of illustrative examples in the Trade Agreements Act. From this extremely narrow position, they are seeking to erect a monumental diversion of the course of the countervailing duty law. The structure of this provision, the context of the prefatory material, and the words of the crucial phrase do not support the defendants' position.

A broad exception for practices or benefits which are generally available is rejected for the following reasons: It is contrary to the fundamental purpose of the law. It is not expressed in the statute. It is not to be read into the law by virtue of legislative history. It has not entered the law through legislative recognition of past administrative practice or through present ad-

---

[19 U.S.C. § 1671(b) ] ), whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any *bounty or grant* upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed. [emphasis supplied]

ministrative interpretation. Finally, it is not needed in order to avoid absurd or ridiculous applications of the law in individual cases.

■ The result in this administrative determination is upheld strictly on the ground that laws of taxation are not subsidies to the taxpayer unless the laws are selective in their terms, or in their administration.

The fundamental purpose of the countervailing duty law is to provide a special duty to eliminate the advantage an imported product may obtain from forms of assistance termed "subsidies." The duty is assessed when a subsidy is found to exist and, in a step not applicable here, when the imported products are found to be causing material injury to an industry in the United States. The primary object of the law is the removal of the advantage of a subsidy or the elimination of injury caused by products possessing the advantage of a subsidy. From the point of view of the objective of the law and those whom it was meant to affect, the extent to which subsidization is practiced in the country of production is entirely immaterial.

The Trade Agreements Act of 1979, which governs this proceeding, used the term "subsidy" to characterize the conduct sought to be equalized.

With respect to domestic subsidies it made plain that certain prototypical domestic subsidies fall within the coverage of the Act.

The Court rejects the proposition that Congress, in the midst of stating comprehensive details of inclusion, also stated an important limitation on the concept of domestic subsidy.

The federal defendants and the defendant intervenors argue that the phrase "specific enterprise or industry, or groups of enterprises or industries" means that the beneficiaries must be some portion of the productive sector of the economy which is singled out from a larger mass. In other words, they argue that the word "specific" means that to be a subsidy, the government action must select a single enterprise or industry, or a specific group of enterprises or industries from out of the larger mass of enterprises or industries that make up the entire productive sector.

In the opinion of the Court this reading is artificial and strained. It is a distortion of a passage which has a far more natural, harmonious, and straightforward intention. The language relied on by the defendants is simply one of the phrases used to insure that the listed government subsidies are covered in the widest possible range of circumstances. The phrase in question fits squarely into a series of meticulous parallel constructions. Thus, the paragraph opens with the alternative of "provided or required," meaning that the subsidy may be given by the government or conceivably compelled to be given by others. This already displays a highly inclusive and cautious phraseology, which might even be considered unnecessary on the ground that a benefit which a government required others to bestow would be provided indirectly and that contingency is covered by the later use of the phrase "directly or indirectly." Nevertheless, since it is possible to argue that there is a distinction between the government using its own funds indirectly and the government simply requiring others to use private funds, the excess of caution shown in this phrase may be justified.

In any event, the broad intention of the opening is evident. The phrase which is in issue here follows, and we will pass over it momentarily to reach the phrase "publicly or privately owned." This too shows an excess of caution because its omission would hardly have left benefits to government-owned enterprises outside the meaning of subsidy. Nevertheless, to anticipate the theoretical argument that a government cannot subsidize that which it owns, the complete spectrum of ownership is covered. We then move through a final series of comprehensive alternatives, "paid or bestowed," "directly or indirectly," "manufacture, production, or export" and "any class or kind." In all, the context conveys an overwhelming comprehensiveness in the

scope of the coverage. This context alone dissolves the plausibility of the appearance in its midst of a momentous exception for "generally available" benefits.

Context aside, the natural meaning of this phrase covers situations in which benefits are given to a single enterprise or to as many as possible.

The word "specific" simply means individual or single. In its position in the sentence it is in perfect balance and contrast with the word "group," meaning any larger conglomeration. In this phrase, as in the preceeding and following phrases, Congress has covered the full range of possibilities, going from the subsidization of a single unit to all larger units, up to and including the entire productive sector. In the opinion of the Court, the entire productive sector of a nation's economy is nothing more than a group of enterprises or industries. It is to be noted, of course, that the words "generally available" are not found anywhere in the law.

The idea that a subsidy can exist only by means of a specific designation or singling out of a favored group from the productive sector has no support in logic or law. In practical terms, it is likely that most subsidies will display selectivity. But, there is no reason why a particular benefit cannot be extended without limitation. A law created to deal with the advantageous effects of such benefits as are enjoyed by imports to be sold in the U.S. is hardly concerned with whether the challenged imports are the only beneficiaries or just one of many.

The simple and direct way to understand the definition of subsidy contained in the Trade Agreements Act of 1979, is to see it as an attempt to cover all possibilities and all situations which fall within the meaning of the term, within the reasonable analogies to the examples or, within the spirit of the law.

The defendants' position also presents at least two insurmountable absurdities. If this prefatory material is read to announce an exception for all benefits which are generally available, then the outcome of an investigation will vary depending on what level of government is providing the benefits, even though exactly the same benefits are given to exactly the same producers. If, let us say, the central government provides benefits to all producers in a particular province, the benefits will be subsidies because the central government has "specified." On the other hand, if the government of the *province* provides the benefits, the benefits are generally available with reference to the power of that level of government and the benefits would not be subsidies. This is a result calculated to subject the law to ridicule.

In addition, if the prefatory material is addressed to all domestic subsidies, one is lead to conclude that domestic subsidies cannot originate from non-governmental sources because the prefatory material explicitly limits itself to government action. Yet no one can deny that the law is written to reach private as well as public subsidies. This facet of the law may not have been fully explored over the years, but it certainly has not been eliminated. Yet this would be one of the consequences if the prefatory material is treated as controlling all cases.

If we examine the specific examples of domestic subsidies listed in the statute we are at a loss to understand what ameliorating or transforming effect can possibly arise from the extension of these benefits to the entire economy. Can it be argued that financial assistance which is inconsistent with commercial considerations is no longer a subsidy when it is part of the basic policy of a government and available to all businesses? This approach cannot be reconciled with the fundamental purpose of the law which must extend to certain commercial advantages even when a country has chosen to make them universally available. The question is not what is normal in the economy under investigation, but rather what is reconcilable with the standards of commercial fairness envisioned by this countervailing duty law.

The plain meaning of this provision and its context do not suggest that "generally available" benefits are excluded from the definition of subsidy. Nevertheless, legis-

lative history is examined by the Court for the possibility that some unusual contrary intent may be revealed.

With respect to section 771(5) the Senate Finance Committee Report stated as follows:

> *Reason for the provision.*—The definition of "subsidy" is intended to clarify that the term has the same meaning which administrative practice and the courts have ascribed to the term "bounty or grant" under section 303 of the Tariff Act of 1930, unless that practice or interpretation is inconsistent with the bill.
>
>   \*    \*    \*    \*    \*    \*
>
> The reference to specific subsidies in the definition is not all inclusive, but rather is *illustrative* of practices which are subsidies within the meaning of the word as used in the bill. The administering authority may expand upon the list of specified subsidies consistent with the basic definition. As under current law, both export and domestic subsidies are subject to countervailing duties, and a subsidy may be provided either by a government or governmental entity, subdivision, or customs union, or by a private party or group of private parties. [emphasis supplied] U.S.Code Cong. & Admin.News 1979, p. 381, 470.

No momentous exceptions are even hinted at in this legislative history. The inclusive intent of this provision is revealed in the following colloquy between Senator Heinz and Senator Ribicoff:

> Mr. HEINZ. This list is intended to define as subsidies some of the more egregious practices of our trading partners....
>
> The point of this language and these examples, Mr. President, is to define subsidy broadly so as to catch within the scope of our law as many unfair trade practices as we can. That, of course, does not mean we countervail, because injury must also be found. It was the Committee's intent, however, that the Treasury Department, or whatever administering authority ends up with this new law, not resolve petitions by arbitrarily concluding that various practices are not subsidies. Better to define the term broadly, as it ought to be defined, and then use the injury test as it is intended to be used.
>
> Can the managers of the bill confirm for me these comments on the definition of subsidy?
>
> Mr. RIBICOFF. May I respond that I can confirm the Senator's comments, and the Senator is correct.
>
> [125 Cong.Rec. S10,313 (daily ed. July 23, 1979)]

If, following the thread of Congressional intent that "subsidy" have the same meaning which the administrative practice and the Courts have ascribed to the terms "bounty or grant," we look to past history, we still find no support for an exclusion of generally available benefits. It is true that the subsidies found to exist in past cases were selectively bestowed. But it was the element of *benefit*, not the element of selectivity, which made them subsidies. In the past, arguments that tried to capitalize on extended degrees of availability were rejected.

For example, an "allowance" paid upon the exportation of British spirits was no less a bounty because the same allowance was given for spirits destined for ships stores, for use in methylation or for use in universities.[3] *Nicholas & Co. v. United States*, 7 Ct.Cust.Appls. 97 (1916); *aff'd.* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). To this degree of extension of the benefit the Court commented "how does the extension of the bounty of a generous government to more than one class of subjects change its character in either case?" 7 Ct.Cust.Appls. at 108–109.

Reasoning that these old cases did not envisage generally available benefits as bounties or grants is impermissible. In

---

**3.** Concerning the use in universities the Court tolerantly observed, "An allowance for goods sold universities, probably encourages attendance and education by enabling students to purchase them cheaper." 7 Ct.Cust.Appls. at 108–109.

fact, they dealt with benefits which were not generally available but in their logic and in the spirit of their application of the law they did not depend on the restriction of the benefit bestowed to a limited class of recipients.

Over the years, had there been the administrative development of an exception for generally available benefits, that exception might conceivably have entered the present understanding of the terms "bounty or grant." Nothing of the sort occurred. In fact, the enforcement history of the law is such that it is doubtful if any administrative exclusion from the terms "bounty or grant" would have become known. The public was not even informed of the conduct of investigations until a 1967 amendment to the Customs Regulations. (32 Fed.Reg. 13276). The Treasury Department did not publish determinations which failed to find the existence of a subsidy until it was required to do so in 1975. (Amendments to Section 303 in the Trade Act of 1974 (88 Stat. 1978, 2050, 19 U.S.C. § 1303(a)(1–6). Even then, it was not until the Trade Agreements Act of 1979 that reasons had to be given. (19 U.S.C. § 1671d(d)) This pattern of administration was hardly calculated to reveal which factors do not a bounty make. So it was not until recently that reasoned decisions on the subject have been made public.

The search for a meaning contrary to the plain meaning of the law leads us finally to the possibility of the defendants' administrative interpretation entering the law in the process of the enactment of the Trade Agreements Act of 1979.

The defendants have argued that in the last part of its tenure over the administration of the countervailing duty law (just prior to the enactment of the Trade Agreements Act of 1979) the Treasury department applied a rule that generally available practices were not subsidies. They refer to *Bicycle Tires and Tubes from the Republic of China*, 43 Fed.Reg. 32912–13 (July 28, 1978); *Certain Textiles and Textile Products from Pakistan*, 44 Fed.Reg. 2746 (January 12, 1979); *Certain Textile and* *Textile Products from Malaysia*, 44 Fed. Reg. 41001 (July 13, 1979); and *Certain Textile and Textile Products from Singapore*, 44 Fed.Reg. 2748 (January 12, 1979).

The Court is of the opinion that these determinations, individually or jointly did not convey a coherent rule regarding "general availability."

The Republic of China preliminary determination states that the exemption from harbor dues of raw materials used in producing the product under investigation "has been determined in prior cases not to be countervailable because the Government's decision to finance harbor facilities by means other than user charges is a legitimate state function that does not confer a bounty to industries which benefit from such facilities." This portion appears to be developing, not an exception for generally available benefits, but an exception for benefits which flow from certain basic types of government activity. The next portion of the determination stated that "there is no information to show that given sectors of the Taiwanese economy benefit from harbor facilities more than others," and drew a contrast to a case in which Canadian grants for the improvement of wharves were determined to be utilized almost exclusively by the fishing industry. This passage could easily be taken as requiring a high degree of selectivity in the benefit; in other words, a standard even more limiting of the concept of subsidy than an exception for generally available benefits. Moreover, as plaintiff points out, the first practice examined in the Chinese Bicycle Tires determination, a 25 percent tax ceiling, was found to be a subsidy, even though, from the determination's report of it, the tax ceiling of 25 percent was available to all firms whose establishment or expansion was approved before a date certain. The tax ceiling was evidently judged by the fact that the preponderance of production was exported, suggesting that some sort of trade-effect standard was applied.

This sort of determination, with its mixture of rationales, is hardly the delineation

of a principle in sufficiently decisive form so that Congress can be said to have become aware of it and adopted it.

The Pakistan determination was too opaque to show whether it found that an accelerated depreciation program was not a subsidy because it did not focus on exports or because it was generally available.

The Malaysia determination has two rationales for finding that duty-free importation was not a bounty or grant. The first was simply that it was established Treasury policy under the countervailing duty law, that duty-free importation of raw materials or components was not a bounty or grant. The second was that the benefit was universally available in Malaysia.

The Singapore determination found that two tax programs were not subsidies because they were "universally available to qualified firms."

From all this, the most that Congress can be said to have been aware of is that, in a growing number of cases, the administrative agency was not treating universally available tax laws as bounties or grants. But, this is a far cry from Congressional ratification of a rule that any practice which was generally available was not a subsidy.

The first administrative determinations which unequivocally attempted a broad exception for generally available government programs were the determinations in the carbon steel investigations, one of which is here under judicial review. This is no more than a contemporary interpretation of the law by an administrative agency which we address in this opinion.

■ As stated earlier, the Court's analysis of the law persuades it that the formulation in this proceeding of a broad exception for generally available benefits is contrary to the plain meaning and intention of the countervailing duty law.

■ The proper subject of this action is the question of whether a law of taxation is a subsidy. This question has not been dealt with before. It is the opinion of the Court that laws of taxation are not subsi-

dies to the taxpayer. Laws of taxation are certainly not subsidies when they first exact taxes. They do not become subsidies to the taxpayer when they present equal opportunities to reduce the exaction. The reduction is no more a subsidy than the basic tax law itself or the repeal of the law. Tax laws become bounties or grants to the taxpayer only if the elimination, or reduction of the tax is selective. Only then can it be said that the bestowal of a benefit has replaced a general decision as to the level of taxation.

■ In more abstract terms, those acts of a government which are fundamentally adverse to the purely economic self-interest of business enterprises are not subsidies. Decisions to reduce or eliminate the adverse effects of those acts are simply forms of a decision as to the desired extent of the adverse effect. The level of adverse effect is transformed into a positive benefit only when a select group is freed from the adverse effect while others are not. That is an act of subsidy by means of selective relief from an adverse condition.

Such acts are distinguishable from acts which are donative or beneficial in their nature, by means of positive displays of largesse in the first instance. The size of the class of beneficiaries has no logical part in deciding whether intrinsically beneficial acts are giving benefits. The benefit of an original beneficial act is self-evident.

The only place for a test of "general availability" is in the determination of whether a practice which is normally not a subsidy, but merely a decision as to the level of an adverse effect, has been transformed into a subsidy by means of selective application. The practice of allowing deductions from taxable income is a decision regarding the level of taxation. It is a practice which is not a subsidy unless it is done selectively.

But laws or acts which give benefits by means other than the contraction of the exercise of governmental power, that is to say, by positive beneficial acts cannot be judged by the same logical standard. If

such benefits are by some chance, generally available, that alone does not provide assurance that they are not subsidies. With respect to benefits resulting from the active bestowal of benefits the development of exceptions should await the clarifying effect of individual cases.

The result reached in this decision is in harmony with the result reached in *Carlisle Tire and Rubber Co. v. United States,* 5 C.I.T. ——, 564 F.Supp. 834 (1983). In that case, tax laws allowing the accelerated depreciation of equipment were held not to be bounties or grants. The rationales of the two decisions are different, however. In *Carlisle,* the Court thought it was reasonable for the ITA to interpret the term "bounty or grant" as a practice which singled out an industry or group of industries for the benefits or privileges, but did not extend to all manufacturers and producers. The Court saw support for this view in the early cases and in dictionary definitions and found a suggestion of support in more recent cases.

In addition, the Court was concerned with the absurdity and insurmountable difficulty of administering a standard by which any benefit provided by the government would be a counteravailable bounty or grant. The Court mentioned such benefits as the construction of public highways, tax credits for capital expenditures and government research and development programs. The Court also read the language of 19 U.S.C. § 1677(5)(B) as limiting the term subsidy to benefits which were not generally available and found this entitled to some weight in the understanding of the earlier terms of "bounty or grant." In this decision the Court does not feel it is necessary to speak to a variety of practices which are not before the Court. It does not see the alternatives as being either the absurd assessment of countervailing duties on all beneficial acts of government or the exclusion from the effect of the law of all benefits which are generally available in a country. Both of these extremes have their absurdities. The Court does not need to enter into broad policy formulations based on general economic tendencies in the world. In the early phases of the interpretation of difficult concepts of legislation (and these are the early days of sophisticated interpretation, despite the long history of such laws) it is best to keep the judicial results focused on the immediate factual pattern arising in each particular case.

 Within the limited exception for tax laws recognized in this opinion the Court finds that there was substantial evidence in the record to support a determination that this was a tax law and that it was not selective in its terms or application. On this ground, this aspect of the administrative determination is affirmed.