**CABOT CORPORATION, Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**Hules Mexicanos, S.A.; and Negromex, S.A., Defendants-Intervenors.**

**Court No. 83–7–01044.**

United States Court of
International Trade.

Oct. 4, 1985.

---

1. The Court also notes that the manufacturer members of FIA contribute 75% of the organization's dues.

Stewart & Stewart, Washington, D.C. (Terence P. Stewart and Eugene L. Stewart, Washington, D.C., on the motion), for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, New York City (Shiela N. Ziff, Washington, D.C., on the motion), for defendant.

O'Connor & Hannan, Washington, D.C. (Joseph E. Pattison, Washington, D.C., on the motion), for defendant-intervenors.

## OPINION AND ORDER

CARMAN, Judge:

Plaintiff commenced this action pursuant to section 516A(a)(2)(A)(ii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(A)(ii) (1982), to challenge a final affirmative countervailing duty determination by the International Trade Administration (ITA). The case is consolidated with *Hules Mexicanos, S.A., and Negromex, S.A. v. United States*, Court Number 83–7–01049, because of the similarity of the issues presented.

Plaintiff, a United States producer of carbon black, moves to review the final affirmative countervailing duty determination and order of the ITA pursuant to Rule 56.1 of the rules of this court. Contending that the determination is unsupported by substantial evidence or otherwise not in accordance with law, the plaintiff seeks a remand to the ITA for redetermination. Defendant and defendant-intervenors oppose the motion, with defendant United States cross-moving to affirm the administrative determination.

## THE ITA DETERMINATION

On December 3, 1982, the ITA published notice that it was initiating a countervailing duty investigation of carbon black imports from Mexico as a result of a petition, filed by plaintiff Cabot Corporation, which alleged that Mexican carbon black producers received a multitude of bounties or grants. 47 Fed.Reg. 54526 (1982). During the investigation, the ITA determined "that the case is extraordinarily complicated because the alleged subsidy practices are numerous and complex and present novel issues".[1]

---

1. The complexity arose out of Mexico's National Industrial Development Plan (NIDP), which, utilizing incentives such as tax rebates, low interest loans and favorable energy rates, sets investment priorities among industrial activities and geographic regions. Note, *United States Coun-*

48 Fed.Reg. 29564, 29564 (1983). But in the final determination, the ITA found the net bounty or grant to be 0.88 percent *ad valorem* and that only the following programs constituted countervailable subsidies: [2]

(1) FOMEX pre-export financing loans at preferential interest rates;

(2) A discount to Hules Mexicanos on its natural gas and electric power costs at its carbon black plant; and

(3) FONEI long term financing at preferential interest rates to Negromex.

The ITA determined that the following programs did not confer bounties or grants to the Mexican producers:

(1) Preferential pricing under the NIDP on petroleum feedstock and natural gas purchased by the carbon black producers from PEMEX at prices below world market prices, and below the prices applicable to the sale of natural gas to commercial and residential consumers; and

(2) the dual currency exchange rate system.

Finally, the ITA additionally determined the following programs are not used by the carbon black producers and exporters:

(1) preferential benefits from the Mexican Government's direct and indirect shareholdings in the two Mexican carbon black producers;

(2) preferential federal and state tax incentives;

(3) FOGAIN and FOMIN preferential financing;

(4) internal transportation benefits;

(5) preferential exports marketing benefits (IMCE);

(6) import duty rebates on equipment used in export production; and

(7) preferential rates on commercial risk insurance.

Plaintiff in this action now makes the following challenges to the final determination of the ITA:

(1) The ITA's finding that the provision of carbon black feedstock and natural gas to Mexican carbon black producers does not constitute a countervailable subsidy is unsupported by substantial evidence and is not supported by law;

(2) the ITA's finding that Hules Mexicanos paid all applicable taxes is unsupported by substantial evidence; and

---

*tervailing Duty Law as Applied to Mexico: The Need for a Material Injury Test*, 18 Geo.Wash.J. Int'l L. & Econ. 183, 184 n. 11 (1984). Following are brief descriptions of some of the programs which touch on this case:

FOMEX (Fund for the Promotion of Exports of Mexican Manufactured Products) is a government trust which provides low-interest loans to Mexican companies to promote the manufacture and sale of exported products. *See* 47 Fed.Reg. 7867 (1982).

FONEI (Fund for Industrial Development) is a specialized financial development fund, administered by the Bank of Mexico, which grants long-term credit at below-market rates for the creation, expansion or modernization of enterprises to foster industrial decentralization. *See* 48 Fed.Reg. 43,063 (1983).

FOGAIN (Fund for the Guarantee of Development of Medium and Small Industry) provides financing at interest rates below prevailing commercial rates. *See* 50 Fed.Reg. 10,824 (1985).

CEPROFIs (Certificates of Fiscal Promotion) are nontransferrable tax certificates used to promote the goals of NIDP. These tax credits are provided to Mexican companies for locating in certain regions, investing in certain infant in-

dustries, generating jobs, investing in new plants and equipment, and purchasing Mexican capital goods. *See* 48 Fed.Reg. 43,063 (1983).

CEDI (Certificado de Devolucion del Impuesto), suspended by the Mexican Government in August 1982, was also a tax rebate. The certificates were direct export subsidies with their value equal to a percentage of the value of qualifying exports.

**2.** Since Mexico was not a "country under the agreement" as set out in 19 U.S.C. § 1671(b) (1982), 19 U.S.C. § 1303 (1982) applied to the investigation. Section 1303(a)(2) provides that the International Trade Commission is not required to determine whether imports of the subject merchandise, which was nondutiable, cause or threaten material injury to a domestic industry as there were no international obligations requiring a determination of injury. Subsequent to the investigation, however, the United States Trade representative announced on April 23, 1985, that Mexico had become a "country under the agreement." *See,* Portable Aluminum Ladders and Certain Components of Ladders from Mexico, 50 Fed.Reg. 21,480 (1985).

(3) the ITA's failure to make any finding regarding the receipt of FONEP preferential financing by Negromex is effectively a negative finding and is unsupported by substantial evidence; and

(4) the ITA erred in calculating the percent *ad valorem* benefit for FONEI loans to Negromex.

## BACKGROUND

Carbon black is elemental carbon with incidental or planned surface oxidation that is formed under the controlled cracking, heating and quenching of a petroleum derivative feedstock, commonly referred to as carbon black feedstock. Carbon black is used primarily in the rubber industry, but is also used in the production of paints, inks, plastics and carbon paper.

Carbon black feedstock, along with natural gas and water, is essential for the production of carbon black. The feedstock is one of many types of petroleum products obtainable from crude oil, but results relatively early in the refining process. After crude oil is heated to cause a breakdown into its constituent parts, one of the constituent parts, "gas oil" or "heavy gas oil," is refined further in a catalytic cracker. In the typical catalytic cracking process, a catalyst is introduced into the heating treatment of the gas oil. At extremely high temperatures and pressures, the gas oil breaks down—cracks—and yields gasoline. Catalytic cracking is a crucial process in the production of gasoline and the prime goal is to produce gasoline. 14 Encyclopedia Britannica, *Petroleum Refining* 183 (15th Ed.1982). There is, however, a further product that results from the catalytic cracking of gas oil: catcracker bottoms, or carbon black feedstock. Catcracker bottoms are the residue that collects at the "bottoms" of catalytic cracking towers after the lighter distillates have been removed.

These catcracker bottoms, according to plaintiff, are a unique product and represent the major cost of producing carbon black. Though there is considerable techni-

cal dispute over whether other residual oils not obtained from catalytic cracking, such as number 6 fuel oil, may also be used for feedstock in the production of carbon black, the Mexican carbon black producers use catcracker bottoms exclusively.

The parties also disagree on the quality of Mexican catcracker bottoms: Defendant and intervenors state that the feedstock, high in sulphur content, is unsuitable for use in countries such as the United States with stringent environmental regulations, while plaintiff avers that it has attempted to obtain, and would use, Mexican feedstock.

It is clear, nevertheless, that the quality and chemical makeup of carbon black feedstock may vary within certain parameters, but that a carbon black plant must be adapted to utilize the particular feedstock available to it. In the case of the Mexican carbon black industry, the two producers, Hules Mexicanos and Negromex, have geared their plants to the use of the catcracker bottoms available from Petroleos Mexicanos (PEMEX), the government owned petroleum company of Mexico. Thus, due to "the inherent nature of the product and the current levels of technology" in Mexico, 48 Fed.Reg. at 29568, no enterprises or industries in Mexico other than the carbon black producers have the technology and ability to make commercial use of the product. Record at 824–28. Plaintiff contends even further that the only commercial use worldwide of catcracker bottoms is by the carbon black industry.

PEMEX manufactures catcracker bottoms as a byproduct resulting from the production of light and middle distillate products. The cracking process may be varied to distill out more or less of the lighter products relative to the residual oils, including carbon black feedstock, bunker fuel oil and asphalt, but the level of carbon black feedstock production appears at least to some extent determined by the overall mix of products produced by PEMEX.

Although PEMEX operates nine catalytic crackers in Mexico, the carbon black producers obtained feedstock of catcracker bottoms primarily from only two facilities located at Ciudad Madero and Salamanca. The two carbon black producers have located their plants close to the two PEMEX refineries, assumedly to obtain this important input economically by reducing transportation costs. The record does not show what happens to the catcracker bottoms from the remaining seven refineries and whether these bottoms are suitable for carbon black feedstock, but the parties have stipulated that small quantities of catcracker bottoms may be blended under carefully controlled conditions into the residual fuel oil pool of a refinery.

An understanding of the provision and pricing of carbon black feedstock and natural gas in Mexico begins with the National Industrial Development Plan (NIDP or the Plan), which offers a comprehensive strategy for industrial growth extending through 1990. Its explicit aim is "to facilitate a dynamic, orderly and steady economic growth." [3] Record, Exhibit F at p. To promote the production of basic consumer goods, the increase of industrial competitiveness in world markets, the exploitation of Mexico's natural resources, and economic integration, the Plan calls for the use of subsidies to encourage exports, domestic production in priority sectors, and economic development in targeted regions. *See supra* note 1. Many of these programs are administered through governmental financial institutions whose resources are strengthened by earnings from petroleum exports. On the other hand, Mexico limits the export of oil reserves to avoid becoming reliant on such exports and uses its remaining oil for the benefit of emerging industry. *See* Joyner, *Petroleos Mexicanos in a Developing Society: The Political Economy of Mexico's National Oil Industry*, 17 Geo.Wash.J. Int'l L. & Econ. 63, 82 (1982).

The NIDP is implemented in part through the special government entity PEMEX, which owns and controls the production of petroleum products in Mexico, and another government agency, at the time of the investigation the Direccion General de Precios of the Secretaria de Comercio, which establishes the prices for all petrochemical products. The carbon black industry, consisting of two producers, purchases needed carbon black feedstock and natural gas exclusively from PEMEX at the government-set prices.[4] During the period investigated, the price for carbon black feedstock as provided to the two carbon black producers was substantially below the "world market" price. The firms received natural gas at the rate for industrial users which is less than that for residential users. Hules Mexicanos received an additional 30 percent concession on the already discounted price for natural gas for its plant which is located in one of the NIDP regional priority zones. Record at 323g. (The ITA found that this benefit did constitute a domestic bounty or grant. 48 Fed. Reg. at 29,566.)

## OPINION

### I. *Preferential Prices on Carbon Black Feedstock and Natural Gas*

Plaintiff first challenges the ITA final determination that Mexico did not confer a countervailable bounty or grant, within the meaning of section 303 of the Tariff Act of 1930, 19 U.S.C. § 1303 (1982), by providing carbon black feedstock and natural gas to Hules Mexicanos and Negromex at below "world market prices". Plaintiff contends

**3.** The NIDP is acknowledged, in part, as a response to Mexico's well-publicized economic plight. Record at p. While the Plan shifts emphasis in many areas of commercial growth, it has long been the policy of the Mexican Government to exercise strict control over the country's economy. *See* Bacon, *Peso Diplomacy, Mexico Hopes Exports Will Help Its Economy Out of the Doldrums,* Wall St.J., Jan. 31, 1985, at 1, col. 6, 21, col. 1.

**4.** PEMEX also owns 60 percent of the capital stock of one of the two carbon black producers, Hules Mexicanos. Record at 323e. (In addition, 10 percent of the shares of Negromex are held by the Nacional Financiera, also an agency of the federal government. Record at 323f.)

that the term "bounty or grant" in section 1303 is to be broadly construed and includes essentially every governmental program which "bestow[s] an unfair competitive advantage on a foreign company as against U.S. producers of the products." Plaintiff's Memorandum at 26. Defendant opposes this proposition, arguing that programs or benefits which are generally available within the exporting country are not countervailable, and further that the applicable statute to look to for the clarification of "bounty or grant" is 19 U.S.C. § 1677(5) (1982). In response, plaintiff secondarily argues that the Mexican carbon black feedstock and natural gas programs are as a factual matter not generally available.

■ In reviewing the countervailing duty law, the Court determines that 19 U.S.C. § 1303 applies to this investigation. Section 1303 clearly delineates those elements that, if present, require the assessment of countervailing duties. The elements are:

(1) Any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation that

(2) pays or bestows

(3) any bounty or grant

(4) upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, and

(5) the importation of such article or merchandise into the United States.[5]

The element of bounty or grant is further defined by the case law and Congress in 19 U.S.C. § 1677(5).[6] First, a bounty or grant is a benefit which gives rise to a "competitive advantage". *See British Steel Corp. v. United States*, 9 C.I.T. ——, 605 F.Supp. 286, 294 (1985); *ASG Industries, Inc. v. United States*, 82 Cust.Ct. 101, 137 C.D. 4797, 467 F.Supp. 1200, 1230 (1979); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

■ Second, in the case of domestic subsidies, the benefit must be conferred upon "a specific enterprise or industry or group of enterprises or industries." 19 U.S.C. § 1677(5); *see also Downs v. United States*, 187 U.S. 496, 501, 23 S.Ct. 222, 223, 47 L.Ed. 275 (1903) (bounty is conferred upon a "class of persons").

■ Congress in enumerating some examples of countervailable subsidies in sec-

---

**5.** 19 U.S.C. § 1303(a)(1) states in full:

Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 1671(b) of this title), whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imported directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

**6.** 19 U.S.C. § 1677(5) provides:

The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies).

(B) The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

(ii) The provision of goods or services at preferential rates.

(iii) The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

(iv) The assumption of any costs or expenses of manufacture, production, or distribution.

tion 1677(5) explicitly stated that the list is not inclusive. The determination of whether a bounty or grant has been bestowed must therefore be made upon the facts of each case. Since the enactment of section 1303 courts have recognized that they must examine the actual results or effects of assistance provided by foreign governments and not the purposes or intentions. *E.g., British Steel Corp.,* 9 C.I.T. at ——, 605 F.Supp. at 293–94; *ASG Industries, Inc.,* 82 Cust.Ct. at 116–17, 467 F.Supp. at 1215. Nor is section 1303 concerned with the nominal availability of a governmental program. The question is what aid or advantage has actually been received "regardless of whatever name or in whatever manner or form or for whatever purpose" the aid was provided. *Nicholas & Co. v. United States,* 7 Cust.Ct.App. 97, 106 (1916), *aff'd* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1916).

■ The ITA applied the incorrect "generally available" test to the question of whether the provision of industrial inputs at government-set prices constitutes a countervailable bounty or grant; therefore the case must be remanded for further investigation. The ITA is directed to apply the test as set forth above to the facts of this case and accordingly investigate whether or not the provision of carbon black feedstock and natural gas in Mexico at government-set prices should be countervailed.

### A. Applicable Law: The Interplay Between Section 1303 and Section 1671

■ As the "direct descendant" of earlier countervailing duty laws, *Bethlehem Steel Corp. v. United States,* 7 C.I.T. ——, 590 F.Supp. 1237, 1239 (1984), section 1303 applies to countervailing duty investigations "[e]xcept in the case of an article or merchandise which is the product of a country under the Agreement." 19 U.S.C.

§ 1303(a)(1). For articles from countries under the Agreement, however, section 1677(5) applies. Mexico was not a country under the Agreement during the period of this investigation, therefore section 1303 is the applicable statute. The ITA stated in its determination, nevertheless, that "[w]hile [the] investigation is governed procedurally by section 303 of the Act, the analysis of programs is based on Title VII of the Act ...," and therefore applied § 1677(5)(B). 48 Fed.Reg. at 29,566. This position is not supported by a careful examination of the statutes and the decisions of this court.

■ Section 1677(5) states first that "subsidy" has the same meaning as "bounty or grant." Thus there is "complete harmony and continuity between the two provisions." *Bethlehem Steel Corp. v. United States,* 7 C.I.T. ——, 590 F.Supp. 1237 (1984). In section 1677(5), added to the Tariff Act of 1930 by the Trade Agreements Act of 1979, Pub.L. No. 96–39, § 101, 93 Stat. 144, 151 (1979), Congress enumerated certain countervailable practices. This did not imply a repeal of section 1303 and its interpretation.[7] Thus, the same analysis applies regardless of which statute controls, and the law defining the term bounty or grant informs the interpretation of the term subsidy. Section 1677(5) does not subsume "bounty or grant."

In sum, section 1303 supplies the substantive law in this case. The administrative, legislative, and judicial pronouncements pertaining to section 1303 are accordingly apt. The Court may nevertheless refer to 19 U.S.C. § 1677(5) in interpreting section 1303. *See Carlisle,* 5 C.I.T. ——, 564 F.Supp. 834; *Bethlehem,* 7 C.I.T. ——, 590 F.Supp. 1237.

### B. The Legal Standard: Countervailability of Generally Available Benefits

The chief issue presented to the Court is whether benefits that are available on a

---

**7.** By leaving the § 1303 term "bounty or grant" undefined, Congress intended that the "metes and bounds of that term be staked out judicially and through administrative practice." *Carlisle Tire & Rubber Co. v. United States,* 5 C.I.T. 229, 233, 564 F.Supp. 834, 837 (1983) (citing *United States v. Zenith Radio Corp.,* 64 CCPA 130, 140 & n. 14, 562 F.2d 1209, 1217 & n. 14 (1977), *aff'd,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

nonpreferential basis—that is, benefits obtainable by any enterprise or industry—can be bounties or grants within the meaning of section 1303 and therefore countervailable. Since any industrial user in Mexico could purchase carbon black feedstock and natural gas at the same price (disregarding the regional discount, *see infra* p. 728), the ITA viewed PEMEX's provision of these inputs at well below world market prices as not constituting a countervailable practice. 48 Fed.Reg. at 29,566. The ITA view was based on the "generally available benefits rule," which has evolved within the administrative agency and was adopted by the court in *Carlisle Tire & Rubber Co. v. United States*, 5 C.I.T. 229, 564 F.Supp. 834 (1983). Two other decisions of this court, however, have rejected the rule as contrary to the countervailing duty statutes, most specifically section 1303, and as therefore unlawful. *Agrexco, Agricultural Export Co. v. United States*, 9 CIT ——, 604 F.Supp. 1238 (1985); *Bethlehem Steel Corp. v. United States*, 7 CIT ——, 590 F.Supp. 1237 (1984). This Court thus faces considerable controversy regarding the rule that generally available benefits provided within the relevant jurisdiction are not countervailable.

The generally available benefits rule as articulated by the defendant is essentially that benefits available to all companies and industries within an economy are not countervailable subsidies. Defendant's conclusions are primarily drawn from 19 U.S.C. § 1677(5)(B), which refers to countervailable domestic subsidies as being those provided to "a *specific* enterprise or industry, or group of enterprises or industries...." (emphasis added). Thus, argues defendant, benefits "generally available" to all enterprises or industries are not subsidies under section 1677(5)(B), and therefore do not fall within the meaning of "bounty or grant" as used in section 1303. Defendant bolsters its interpretation by citing *Carlisle Tire & Rubber Co. v. United States*, 5 C.I.T. 229, 564 F.Supp. 834.

In *Carlisle*, the court upheld the ITA's interpretation of section 1303 as being reasonable. *Id.* at ——, 564 F.Supp. at 838. The court relied in part on older case law which described a bounty or grant as a "special advantage," citing *Nicholas & Co. v. United States*, 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919), or "an additional benefit" conferred upon a "class of persons," citing *Downs v. United States*, 187 U.S. 496, 501, 23 S.Ct. 222, 223, 47 L.Ed. 275 (1903). Apparently the ITA and the court in *Carlisle* view the noncountervailability of generally available benefits as the opposite side of the coin from the countervailability of benefits conferred upon a specific class. There is a distinction, however, which has not been clearly deciphered by the ITA or in prior judicial opinions, but which disrupts the apparent symmetry of the two sides of the coin.

The distinction that has evaded the ITA is that not all so-called generally available benefits are alike—some are benefits accruing generally to all citizens, while others are benefits that when actually conferred accrue to specific individuals or classes. Thus, while it is true that a generalized benefit provided by government, such as national defense, education or infrastructure, is not a countervailable bounty or grant, a generally available benefit—one that may be obtained by any and all enterprises or industries—may nevertheless accrue to specific recipients. General benefits are not conferred upon any specific individuals or classes, while generally *available* benefits, when actually bestowed, may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties.

The court in *Carlisle* recognized the absurdity of a rule that would require the imposition of countervailing duties where producers or importers have benefited from general subsidies, as "almost every product which enters international commerce" would be subject to countervailing duties.[8] *See* 5 C.I.T. at ——, 564 F.Supp.

---

8. A chief concern of the court in *Carlisle* was

avoiding the absurd result of countervailing

at 838 (citing Barcelo, *Subsidies and Countervailing Duties—Analysis and a Proposal,* 9 L. & Pol'y in Int'l Bus. 779, 836 (1977)). Alternatively, the court in *Bethlehem* recognized the absurdity of a law that would transform an obvious subsidy into a non-countervailable benefit merely by extending the availability of the subsidy to the entire economy. 7 C.I.T. at ——, 590 F.Supp. at 1242. Thus, although a bounty or grant is preferential in nature, bestowed upon an individual class, the generally available benefits rule as developed and applied by the ITA is not an acceptable legal standard for determining the countervailability of benefits under section 1303.

■■■ The appropriate standard focuses on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits. The case must therefore be remanded for further investigation and redetermination. The definition of "bounty or grant" under section 1303 as intended by Congress remains as it is embodied in the case law and later affirmed by Congress in section 1677(5). This definition requires focusing only on whether a benefit or "competitive advantage" has been actually conferred on a "specific enterprise or industry, or group of enterprises or industries." In the case before the Court, the *availability* of carbon black feedstock and natural gas at controlled prices does not determine whether the benefits actually received by these two carbon black producers are countervailable subsidies. The programs appear

to effect specific quantifiable provisions of carbon black feedstock and natural gas to specific identifiable enterprises. That additional enterprises or industries can participate in the programs, whether theoretically or actually, does not destroy the programs as subsidies. The programs are apparently available to all Mexican enterprises, but in their actual implementation may result in special bestowals upon specific enterprises.

■■■ Once it has been determined that there has been a bestowal upon a specific class, the second aspect of the definition of bounty or grant requires looking at the bestowal and determining if it amounts to an additional benefit or competitive advantage. If so, the benefit might fit within one of the illustrative examples of 19 U.S.C. § 1677(5)(B). The ITA, however, prematurely concluded that "the provision of carbon black feedstock and natural gas clearly involves the provision of goods within the meaning of subsection (ii)," 48 Fed.Reg. at 29568, that is, the subsidy example of providing goods or services at preferential rates. The ITA asserted, "[t]he standard contained in subsection (ii) is 'preferential,' which normally means only more favorable to some within the relevant jurisdiction than to others within the jurisdiction." 48 Fed.Reg. at 29,568. Thus, concluded the ITA, "even if carbon black feedstock and natural gas were not generally available, we would not find this

---

"such things as public highways and bridges, as well as a tax credit for expenditures on capital investment even if available to all industries and sectors." *Carlisle,* 5 C.I.T. at ——, 564 F.Supp. at 838. The court's concern seemed directed toward "general subsidies that most governments confer such as national defense, government-subsidized education and infrastructure, and sufficient public health and agricultural extension programs." G. Bryan, *Taxing Unfair International Trade Practices* 297 (1980). Such subsidies are distinguished from selective subsidies, examples of which are outlined in 19 U.S.C. § 1677(5). *Id.*

"General subsidies" may also be looked at in economic terms as provisions of *public goods.* Governments provide many such goods and services because of the inability of the price system

to effectively provide these goods, which tend to be indivisible and collectively consumable by all citizens whether they pay for them or not. E. Mansfield, *Economics Principles, Problems, Decisions* 68, 74–78 (4th ed. 1983). This public good analysis is in alignment with the analysis under § 1303. A public good provided by government benefits society in a collective manner. It is not conferred upon any specific enterprise or industry.

With respect to the tax laws such as credits, accelerated methods of depreciation, and special depreciation recapture rules, issues may be more complicated. Each program must therefore be examined on a case by case basis to determine if the benefit accrues to specific beneficiaries or generally to society.

rate to be a subsidy, because this rate is not preferential...." *Id.*

▮▮▮▮ The ITA has engaged in a tautology, merely extending its generally available benefits rule into the illustrative example of subsection (ii). Although preferential pricing clearly is a countervailable subsidy, subsection (ii), as only one such example of a subsidy, does not include all pricing programs constituting subsidies. The ITA's attention must therefore be directed to the broader question of whether the Mexican pricing programs for carbon black feedstock and natural gas are additional benefits or competitive advantages within the scope of section 1303.[9]

## II. *Payment of All Applicable Taxes by Hules Mexicanos*

▮▮ Plaintiff contends that the ITA failed to fully investigate whether Hules Mexicanos received any tax exemptions for carbon black production. According to plaintiff, the existence of certain tax exemptions connected with the production of two synthetic rubber products as noted in the 1977 Hules Mexicanos Annual Report should have elicited further investigation into subsequent annual reports, as should have a statement from the 1977 report that the exemption petition regarding carbon black was under negotiation. The Court finds, however, that the ITA's finding based on financial statements from 1977 through 1982 that Hules Mexicanos paid all applicable taxes is supported by substantial evidence on the record. *Cf. American Spring Wire Corp. v. United States,* 8 C.I.T. ——, 590 F.Supp. 1273 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (CAFC 1985).

## III. *FONEP Preferential Financing*

▮▮ The 1980 Negromex Annual Report indicated that a Mexican currency loan from Fondo Nacional de Estudios y Proyectos (FONEP) was granted through Nacional Financiera. Record at 555. Although there appears to be no further mention of the loan in the administrative record, defendant claims before this Court in this action that the ITA found no evidence of a FONEP loan to Negromex for carbon black production in reviewing all company loan documents. Intervenors state further that "the officials performing the verification at Negromex immediately became aware of the FONEP loans after requesting this debt information and, after reviewing the FONEP loan contract[,] ... verified that it was exclusively for expenditures on synthetic rubber production and not for carbon black." Intervenors' Memorandum at 60. Neither defendant nor intervenors offer a citation to the record showing that the ITA considered the FONEP loan.

Plaintiff argues that the ITA was required to probe into the loan and make an explicit finding, while defendant contends that plaintiff's failure to make the claim during the administrative proceeding places the issue outside the scope of judicial re-

---

**9.** Plaintiff argues that a price below the world market price is a per se countervailable benefit. The matter is more complex. The availability of inputs at low prices to foreign producers may be the result of various non-countervailable factors such as comparative advantage. *See* T. Pugel, *The Fundamentals of International Trade and Investment,* in Handbook of International Business 1–2, 4 (I. Walter ed. 1982). The facts of this case indicate that the Mexican carbon black producers have located themselves (although perhaps pursuant to the NIDP) to take advantage of available carbon black feedstock with specific qualities. This arrangement might allow PEMEX to sell a byproduct which would otherwise go unsold. Thus, prices below the world market price or the export price may simply be the result of a symbiotic industrial relationship. Further, PEMEX's refusal to sell carbon black feedstock abroad to plaintiff might be on account of limited Mexican domestic supply.

On the other hand, "generally available" benefits are not necessarily the result of the exercise of comparative advantage. It cannot be concluded merely on the basis of nominal availability and absent further investigation that the prices for carbon black feedstock and natural gas as set by PEMEX are the result of factors such as excess supply and low production cost. *See contra* Note, *Upstream Subsidies and U.S. Countervailing Duty Law: The Mexican Ammonia Decision and the Trade Remedies Reform Act of 1984,* Law and Pol'y in Int'l Bus. 263, 291 & n. 126 (1985).

view. Although 19 U.S.C. § 1516a(b)(1)(B) limits the Court's review to the administrative record, the existence of a FONEP loan is noted in the record. Since the circumstances regarding the ITA's handling of this matter are unclear, the Court directs the ITA upon remand to make an explicit finding supported by substantial evidence regarding the FONEP loan to Negromex.

## IV. *Calculation of the Benefit for FONEI Loans to Negromex*

Concerning the calculation of the value of FONEI loans to Negromex, defendant concedes that plaintiff's calculations are correct and the error would be corrected in the section 751 (19 U.S.C. § 1675) review then in progress at the time of the filing of defendant's cross-motion for review upon the agency record. Plaintiff has apparently acquiesced in this result.

## CONCLUSION

The rule of not countervailing generally available benefits as developed by the ITA does not render a correct result in this case. The *availability* of carbon black feedstock at government-set rates is not the determinative factor regarding countervailability. Rather, the inquiry for the ITA is whether the rates in fact afford the carbon black producers a benefit or competitive advantage. The case must therefore be remanded for further investigation and redetermination consistent with the requirements set forth in this opinion to determine if countervailing duties should be assessed.

The ITA's determination that Hules Mexicanos paid all applicable taxes for the period under investigation is sustained. Because it is unclear what transpired regarding the FONEP loan to Negromex noted in the company's 1980 Annual Report, the ITA is directed to make an explicit finding supported by substantial evidence regarding its investigation of the loan. The Court makes no ruling on plaintiff's fourth claim since defendant has conceded its error in calculating the benefit for FONEI loans to Negromex.

## ORDER

Upon reading and filing plaintiff's motion for review of the administrative determination upon the agency record, defendant's cross-motion, and upon all other papers and proceedings had herein, it is hereby

ORDERED, ADJUDGED and DECREED that:

Plaintiff's motion for review upon the agency record is granted in part;

Defendant's motion for review upon the agency record is granted in part;

The case be remanded to the International Trade Administration for further investigation and redetermination regarding Mexico's provision of carbon black feedstock and natural gas at government-set rates to Hules Mexicanos and Negromex;

The ITA determine, in accordance with the test outlined in the accompanying opinion, whether the provision of carbon black feedstock and natural gas at government-set rates constitutes a countervailable bounty or grant and, if so, the valuation of any such bounty or grant;

The ITA's determination regarding payment of all applicable taxes by Hules Mexicanos is sustained; and

The ITA make a finding supported by substantial evidence regarding FONEP loans to Negromex.

The Secretary of Commerce or his delegate shall report his findings and redeterminations to this Court, and supplement the administrative record as provided above, within 90 days after the date of entry of this order.