**AGREXCO, AGRICULTURAL EXPORT CO., LTD., et al., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

**Consol. No. 80–10–01578.**

United States Court of
International Trade.

Feb. 1, 1985.

Kaplan Russin & Vecchi, Washington, D.C. (Julius Kaplan, Dennis James, Jr. and Kathleen F. Patterson, Washington, D.C., on the briefs) for plaintiff, Agrexco, Agr. Export Co., Ltd.

Eugene L. Stewart, Washington, D.C. (Paul W. Jameson, Washington, D.C., with him on the brief) for plaintiff, Roses, Inc.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch (Sheila N. Ziff, Washington, D.C., on the briefs) for defendant.

RAO, Judge:

This case involves fresh cut roses, imported from Israel, which were the subject of a countervailing duty petition filed by the plaintiff, Roses, Inc. (Roses), a trade association of the domestic rose growing industry representing the majority of commercial rose growers in the United States. The petition, filed with the Commissioner of Customs on November 15, 1979, alleged that the Government of Israel was paying or bestowing, directly or indirectly, bounties or grants with respect to the production and exportation of cut roses to the United States. The Department of the Treasury did not initiate an investigation before December 31, 1979 and on January 2, 1980 the authority for administering the countervailing duty laws was transferred from the Department of the Treasury to the Department of Commerce (Commerce). Commerce initiated an investigation and published a Notice of Initiation of Investigation in the *Federal Register* on February 1, 1980. 45 Fed.Reg. 7273 (1980).

Since Israel is not a "country under the Agreement", section 303 of the Tariff Act of 1930, as amended by section 103(b) of the Trade Agreements Act of 1979 [19 U.S.C. § 1303] applied and no finding of injury to an American industry was required. Commerce decided that the case was "extremely complicated" because

there were twenty separate programs for which subsidy information was requested and published a Notice of Postponement of Preliminary Determination in the *Federal Register* on March 14, 1980 (45 Fed.Reg. 16522–23). The Preliminary Countervailing Determination was published in the *Federal Register* on June 10, 1980. Commerce found some of the programs, discussed *infra*, to be countervailable and some were found not to be in effect or not utilized. The estimated aggregate net amount of the subsidies was determined to be 3.8% of the f.o.b. value of the exported cut roses.

The International Trade Administration (ITA) verified this determination and a Final Determination was published in the *Federal Register*, 45 Fed.Reg. 58516–19 (1980), which was essentially the same as the preliminary determination, except that the final net subsidy rate was found to be 2.02% of the f.o.b. value of the exported merchandise.

Roses filed a summons and complaint in this Court contesting the validity of the final determination and subsequently, Agrexco, Agricultural Export Company, Ltd. (Agrexco) also filed a summons in this Court contesting the validity of the final determination. These cases were consolidated by order of this Court because they involved common issues of fact and of law. Subsequently, Roses filed a motion for summary judgment, Agrexco filed a cross-motion for summary judgment, and the United States opposed both these motions for summary judgment and cross-moved for summary judgment affirming its Final Countervailing Duty Determination.

Thereafter, Commerce admitted that as to three of the programs for which review was requested it had erred in its consideration as to whether a bounty or a grant had been bestowed. It moved for a partial remand to permit the ITA to reinvestigate and verify these programs:

(a) the Israeli government supported minimum price program,

(b) the Israeli government sponsored loans to Agrexco for the financing of working capital and accounts receivable, and

(c) the Israeli government assistance in the expansion, during 1978–79 of Agrexco's facilities at Ben Gurion Airport from which the roses are airfreighted to the United States,

and this Court granted defendant's motion.

As a result of its reconsideration, the ITA found that the government supported minimum price program conferred a benefit of 2.5%, that the government sponsored loans to Agrexco for the financing of working capital and accounts receivable conferred a benefit of 8.54%, and that the 1978–79 expansion of Agrexco's facilities at the airport was found to confer a benefit of 0.12 per cent. Agrexco contests each of these determinations as being unlawful or contrary to the evidence.

In addition to reviewing the above programs, this Court will now consider the other programs that plaintiffs protest with respect to this countervailing duty determination. These programs include:

(d) exemption to approved packing houses from payment of two-thirds of the property tax on buildings used by each enterprise,

(e) exemption to Agrexco and the approved packing houses from payment of one-sixth of the property tax on equipment used by each enterprise,

(f) cash payments related to the property, machinery, equipment and buildings used by Agrexco,

(g) accelerated depreciation for machinery, equipment and buildings used by Agrexco,

(h) cash payments to growers for greenhouses,

(i) cash payments to packing houses for buildings and equipment,

(j) payments by the government equal to a percentage of the export value added, refunds for government participation in marketing, and cash rebates for every dollar of export sales,

(k) government support of regional relocation programs,

(*l*) refund of a portion of export insurance premiums,

(m) government participation in research and development related to roses and flowers,

(n) government funded extension services provided to rose growers,

(o) government support of the Ornamental Plant Production and Marketing Board.

There is no doubt that this case is "extraordinarily complicated" as Commerce had originally determined. There are at least 26 varieties of roses grown and exported from Israel, world-wide. Some are air-freighted directly to the United States and some are sent to European auctions from which shipments are also made to the United States.

The rose industry in Israel consists of growers, individuals who operate greenhouses and actually grow the roses; the eight packing houses which collect, sort, grade and pack the cut roses and deliver them to the airport; and Agrexco, which has an air-freight facility at Ben Gurion Airport and which assumes the responsibility for exporting all flowers and for marketing flowers abroad. It exports 90 per cent of the roses exported from Israel and is owned in part by the Government of Israel.

It is Roses' position that the benefits bestowed at each level of production amount to countervailable bounties or grants.  ·

As to the growers, the benefits would include cash payments for greenhouses, support of regional relocation programs, government participation in research and development related to roses and flowers, government funded extension services provided to rose growers and government support of the Ornamental Plant Production and Marketing Board. The ITA determined that cash payments to growers for greenhouses amounted to a subsidy of 0.364 per cent of the f.o.b. value of the merchandise. The value of the benefit was calculated by taking 33.5 per cent of the total payments and allocating the result on a straight line basis over 10 years (half the useful life of the greenhouses) and by then allocating the benefit attributable to the 1978/79 growing season over the 1978/79 rose exports.

This Court has considered the use of a period of half the accounting life of a capital asset to determine the value of a grant and has found it improper, not based on fact and not embodying generally accepted principles or methods of financial accounting or analysis. In *Michelin Tire Corp. v. United States*, 4 C.I.T. 252, 254, 255, (1982), the Court held that:

> [T]he use of a period of half the accounting life of the capital assets amounts to a procrustean method, unrelated to the facts, and unsupported by law or rule ...
>
> The arbitrary compression of useful life is wrong.

The Court went on to discuss an alternative method, the sum of the digits, which it also rejected, and it remanded the case to the ITA for redetermination. We do the same.

Those other programs involved herein for which the allocation of benefit was also arrived at by the use of a period of half the accounting life are also due to be remanded to the ITA for redetermination. These included cash payments to packing houses related to the property, machinery and equipment [ (i) *supra* ] and the government development grant to Agrexco for an export facility at Ben Gurion Airport [ (c) *supra* ].

As to the benefits conferred by government research and development, it is generally held that these programs do not confer subsidies when the research and development are provided for a wide range of disciplines and projects. Commerce found no subsidy because the results are disseminated to all growers and to the general public. It made a point of informing the Court that the results of this program were equally available to rose growers worldwide, including members of Roses, Inc. This Court is of the opinion that it is immaterial whether the information is disseminated to all groups, but whether the research and development is targeted to

assist a particular, rather than a general industry. The brief for the United States contains statements which indicate that the publications disseminating the results of the research and development were "... the best examples of practical rose production." If the research and development is targeted to the production of roses, it is a subsidy. We remand this program to Commerce for a determination of its value. *Cf. Bethlehem Steel Corp. v. United States*, 7 C.I.T. ——, 590 F.Supp. 1237 (1984), in which the Court discussed generally available benefits and rejected their general exclusion under the countervailing duty law.

■ We reach the same conclusion as to the extension services provided to the rose growers. If the net result of these services provided the rose growers with specific assists that would not benefit other sectors of the agricultural segment of the Israeli economy, then it is the opinion of this Court that they would be countervailable if not *de minimus*. We remand this to the ITA for a determination of the value of the subsidy.

■ With respect to Commerce's finding that government support of the Ornamental Plant Production and Marketing Board is not a subsidy, the following considerations apply. It is Roses' position that *any* government support of this board, which provides services to the rose industry gratis should be, to that extent, considered a bounty or a grant. Commerce takes the position that this Board receives no government funding, and, therefore, no subsidy can be found. Funding is not the only form of assist that can be given. The record shows that the Government of Israel provides some of the Board membership, and it has not been determined whether these members are compensated for their activities as Board members. If, however, their salaries are paid by the Government of Israel and if it is part of their official or government function to serve on the Board, it is the opinion of this Court that some subsidization has occurred. Also, if the government has provided other assistance to the Board, such as free facilities, these should also be considered. This matter is remanded to Commerce for further investigation.

■ As to the redetermination of the value of the minimum price program, on remand the ITA requested information concerning this program both from the Government of Israel and from Agrexco, noting in both requests the need for the information before the expiration of the time within which it was required to report the results of its redetermination to this Court. When the information that was forwarded to it by the Government of Israel and Agrexco concerning this program was found to be contradictory and incomplete, incapable of verification, the ITA turned to the data provided to it by Roses in support of its petition and assessed a countervailing duty rate of 2.5 per cent of value, citing the mandate of the statute, section 776 of the Tariff Act of 1930 (19 U.S.C. 1677e), which expressly authorizes Commerce, if it is unable to verify the accuracy of the information submitted, to use the best information available to it, including that provided by the petitioner. However, the Government admits that there is no information in the record with respect to the sales prices of roses resold to the United States through the European auctions (see defendant's response in opposition to the supplemental brief of plaintiff, Agrexco and in support of its cross-motion for summary judgment, page 15). The measurement of a grant must be made in the most reasonable commercial terms. *Michelin Tire Corp. v. United States*, 6 C.I.T. ——, Slip Op. 83–136 (December 22, 1983). And, this measurement must be specific for each recipient in order for it to be reasonable within the intendment of the countervailing duty law. *Id.* It is concluded by this Court that the specificity requirement enunciated in *Michelin, supra*, has not been met for this program. If the data as to the number of roses and the prices at which they were exported to the United States through the European auction houses is not part of the record of this case, it can be concluded that accurate information was not available to

Roses at the time it filed its petition. That being the case, its statement that roses from Israel benefit from a 2.5 per cent grant because of the minimum price support program was speculative and not supported by substantial evidence. It is remanded for further proceedings in accordance with this opinion.

■ We turn now to those programs for which Agrexco obtained loans at preferential rates, i.e., preferential export financing. Commerce had originally computed the value of this benefit by comparing the interest rate which Agrexco paid with the overdraft rate then applicable in Israel. On remand, Commerce found three different funds or sources of financing with different rates and conditions, and determined the value of the benefit by comparing the rates utilized with those for comparable sources of financing. Agrexco argues that the rate at which it could have borrowed money from New York banks (1 and ¼ per cent above prime) is the proper rate to use for comparison, and that it would have been exempt from the 12 per cent surcharge applicable to foreign loans. Commerce found that the information supplied by Agrexco in support of this position was unsupported by properly corroborative documentation. It takes the position that had Agrexco been exempted from paying the surcharge, that in itself might have constituted a subsidy. Since we concur that Commerce used the proper method in computing the benefit bestowed by preferential financing, we need not address this additional consideration.

We turn to the program by reason of which Agrexco and three of the packing houses were exempted from paying a portion (two-thirds) of any property tax on buildings for which they were liable, under the Israeli Encouragement of Capital Law (ECIL). Commerce determined that this provision of the ECIL was repealed in 1978, but that Agrexco and the packing houses remained eligible to receive benefits under the program during 1978–79. Commerce was informed through Agrexco's Israeli attorney of an agreement between Agrexco and the Airport Authority, which owned the facilities used by Agrexco, that it had "no obligation under law to pay property tax." Commerce took the position that this agreement, rather than the provisions of the ECIL relieved Agrexco from the legal liability to pay property tax and that until Agrexco is legally obligated to pay the tax, exemption from the liability is not to be considered a countervailable benefit. Commerce accordingly determined that the subsidy rate for this program was zero.

■ Generally, exemption from the payment of real property taxes is held to be a subsidy. *See* Sturm, *Customs Law and Administration,* § 58.2. Without dwelling on the legal question of whether buildings constitute real property or whether the general principle enunciated *supra* can be expanded to include buildings, we turn to whether the exemption constituted a benefit. This Court is of the opinion that it is not germaine whether Agrexco and the packing houses are exempted from paying the tax by reason of an agreement with the Airport Authority, which we assume is an agency of the Israeli government, rather than under the ECIL. The issue is whether it is exempted, by government action, from paying taxes that are paid by other firms. For each year that it has received an exemption from the government from the payment of taxes, it has received a benefit. The same is true of the packing houses. *See Bethlehem Steel Corp. v. United States,* 7 C.I.T. ——, 590 F.Supp. 1237 (1984), for a cogent discussion on this topic by Judge Watson.

It is Roses' position that the value of this benefit is 100 per cent of the reduction in the property tax on buildings, whereas Commerce has already indicated that it would value the benefit by taking into account the savings only to the rose sector for the exemption from payment of the property tax resulting from the ECIL provisions allowing preferential tax rates for buildings. We leave to the agency the task of finding the proper value of this benefit, taking into consideration the benefit de-

rived from the agreement with the Airport Authority.

Similar is the issue of whether exemption from paying of one-sixth of the property tax on equipment used by Agrexco and the approved packing houses. Commerce calculated the net subsidy to be equal to 0.06 per cent based on equipment values provided in tax returns or based on equipment values provided by the Board. What the Court cannot determine from the information provided is the basis for the valuation of the equipment for tax purposes; that is, whether an independent valuation of the equipment is made by the taxing authority, whether valuation is ever required or whether the values provided by the Board are accepted without question. Another question is whether the valuation process for the rose industry is more favorable than that for other industries.

Again, Roses argues that the benefit received was 100 per cent of the property tax that was not paid, but again, the agency will be permitted to arrive at the value of the benefit.

█ Roses also contests Commerce's determination that there was no countervailable benefit derived by Agrexco from the provisions for accelerated depreciation under the provisions of the ECIL. These amounts to a rate of 200 per cent for machinery and equipment and 400 per cent for buildings. Although the benefits to be derived from these provisions were not used by Agrexco, because it paid no income taxes in 1978–79, Roses takes the position that a benefit is bestowed because the loss due to depreciation can be carried over to future years when it would otherwise show a profit. The government, correctly, cites legislative history to buttress its position that only *current* benefits can be considered countervailable subsidies. The House Ways and Means Committee Report on the Trade Agreements Act of 1979 states (H.Rep. No. 96–317, 96th Cong., 1st Sess. 74 (1979)):

> With respect to a 'net subsidy' under subsection (b), the Committee intends that the authority will determine the

amount of a gross subsidy by determining the value of the subsidy bestowed or otherwise made available to the extent such a subsidy is actually used. For example, if a firm were given a tax deduction for moving to a disadvantaged area, the value of the subsidy is the tax deduction available. However, *amounts of the tax deduction not actually used would not be included in the gross subsidy amount* ... [Emphasis supplied.]

Additionally, Commerce has stated that it is well aware of the existence of the provisions of the ECIL and will scrutinize the results of the provisions for accelerated depreciation in future annual reviews under Section 751(a). If accelerated depreciation is being used under the ECIL, Commerce would include this fact in future annual reviews. The Court finds that this approach is in accordance with the law.

█ This principle is also applicable to the provision for refunding a portion of export insurance premiums. Commerce determined, and the verification Report stated, that no insurance premiums were paid for rose shipments. This statement was made by one Mr. Sofer of Agrexco and one Mr. Goren during the verification. Roses insists that this evidence is insufficient and that the ITA should have asked to examine books of account, ledgers, etc. to determine whether these statements were correct. This court will not substitute its standards of proof (nor those of Roses) for the verification carried on by the ITA. It apparently found no discrepancy, nor can Roses show any, that would lead to the conclusion that these statements were erroneous. We accept the finding of the ITA that the benefits under the program for the refund of a portion of export insurance premiums was not used by Agrexco and that no subsidy resulted therefrom.

█ Roses also challenges Commerce's determination that rose growers did not benefit from the regional relocation program. The ITA ascertained that only enterprises that qualified under the ECIL were eligible to receive these grants. Rose growers were not approved under the

ECIL and therefore could not qualify. This fact was verified by Y. Shehory, Deputy, Director General of the ECIL. Roses takes the position that this verification is insufficient, and that therefore Commerce should have used the best information available, viz, that supplied by Roses in support of its petition. This court will not remand this issue for further verification. Absent some showing that Mr. Shehory acted in bad faith, misstated the facts or was disqualified from certifying that rose growers were ineligible under the regional relocation program, we cannot conclude that Commerce's determination was based on insufficient evidence or contrary to law.

Under the Export Promotion Financing Fund, the government of Israel compensated exporters for expenses such as advertising, merchandising and public relations (IL 0.10 for every dollar of exports for the expenses of marketing and up to $0.30 for every dollar of exports as a cash refund). These programs were abolished in 1977. Although Commerce was unable to verify amounts paid on total exports of flowers, it did verify the sales promotion budget for flower exports to the United States for the year 1978–79 and calculated the *ad valorem* value of this program by multiplying the budget amount by 33.5 per cent (the proportion of flower exports represented by roses) and dividing the result by the dollar value of rose exports to the United States. On this basis it found a subsidy of 0.67 of the f.o.b. value of the merchandise.

It is not clear to this Court whether the sales promotion budget, which was supplied by the Israeli Ministry of Agriculture) takes into account both these benefits. It does not take into account compensation paid for roses which were shipped to the European auctions and then transshipped to the United States. Therefore we remand this issue for reconsideration by Commerce to determine whether the promotion budget covers both rebates and whether it can be determined what percentage of the rebates paid for roses shipped to the European auctions accrued to the benefit of those roses which were then transshipped to the United States.

 For the reasons expressed herein, and due to the fact that the Court's decision may result in a reduction of the countervailing duty rate, this action is remanded to Commerce for further proceedings in accordance with this opinion. The parties are directed to confer with one another and attempt to agree on a schedule for proceeding on remand and for reporting the results of their consultation to the Court. If the parties cannot reach agreement within thirty days from the date of this order, the Court will order a schedule for further proceedings.