ROSES, INC., California Floral Trade Council, and Floral Trade Council, Plaintiffs,

v.

The UNITED STATES, Defendant,

Anapromex, Defendant–Intervenor.

Court No. 84–5–00632.

United States Court of International Trade.

July 3, 1990.

---

being provided to producers or exporters in Mexico of fresh cut flowers, ..." *Final Determination* at 15007.

Plaintiffs challenge this determination, claiming that ITA's finding that financing provided to Mexican flower growers did not constitute a bounty or grant because it was not provided to a specific enterprise or industry, or group of enterprises or industries, was not supported by substantial evidence in the record or was otherwise not in accordance with law.

## BACKGROUND

On September 30, 1983, ITA received a petition from the California Floral Trade Council, Floral Trade Council, and Roses, Inc., filed on behalf of the United States industry producing fresh cut flowers. Administrative Record Document (A.R.Doc.) 1. The petition alleged that manufacturers, producers or exporters in Mexico of certain fresh cut flowers received, directly or indirectly, bounties or grants within the meaning of section 303 of the Act, including (1) exemption of import duties; (2) preferential long and short term financing, loan guarantees, and reimbursement to commercial banks funding technical services to flower growers, all through a government program called the Funds Established with Relationship to Agriculture (FIRA); (3) financing for investment credit through the Special Trust for Agricultural Finance (FEFA); (4) marketing services provided by the Instituto Mexicano de Comercio Exterior (IMCE); and (5) a state grant to the University of Floriculture which provides research and development and manpower training for the Mexican flower industry. *Id.*

Commerce found the petition to contain sufficient grounds upon which to initiate a countervailing duty investigation and, on October 26, 1983, published its notice of *Initiation of Countervailing Duty Investigation; Certain Fresh Cut Flowers from Mexico*, 48 Fed.Reg. 49531 (1983). Commerce announced that, in addition to petitioner's allegations, it would investigate certain other Mexican programs previously found to confer bounties or grants. *Id.*

Stewart and Stewart, (David Scott Nance and Geert De Prest at the hearing, Eugene Stewart, Terence P. Stewart and Geert De Prest, Washington, D.C., on the brief), for plaintiffs.

Stewart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, (Jeanne E. Davidson at the hearing, Sheila N. Ziff on the brief), of counsel (Andrea Dynes at the hearing, Gaylin Soponis on the brief), Atty. Adviser, U.S. Dept. of Commerce, Washington, D.C., for defendant.

Porter, Wright, Morris & Arthur, (Leslie Alan Glick), Columbus, Ohio, for defendant-intervenor.

## MEMORANDUM AND ORDER

RESTANI, Judge:

Plaintiffs move for judgment on the administrative record of *Certain Fresh Cut Flowers From Mexico*, 49 Fed.Reg. 15007 (1984) (*Final Determination*). The International Trade Administration (ITA or Commerce) conducted this investigation under section 303 et seq. of the Tariff Act of 1930, as amended, 19 U.S.C. § 1303 et seq. (1982), and determined that "no benefits that constitute bounties or grants within the meaning of section 303 of the Tariff Act of 1930, as amended (the Act), are

Commerce also investigated an export subsidy allegation.[1] See *Postponement of Countervailing Duty Investigation; Certain Fresh Cut Flowers From Mexico*, 48 Fed.Reg. 55492 (1983).

On February 1, 1984, ITA published its *Certain Fresh Cut Flowers from Mexico; Preliminary Negative Countervailing Duty Determination*, 49 Fed.Reg. 4023 (1984). The notice stated that Commerce had preliminarily determined that one flower company, Florex S.P.R. (Florex), had received one FIRA loan during the period of investigation, that is, January 1, 1982 to September 30, 1983, and that ITA required more information on FIRA. The notice stated, in part:

> The government of Mexico stated that only one flower company received a loan through FIRA. The loan was granted to Florex S.P.R. in 1983 to enable it to purchase the assets of another company, Flores de Occidente. In order to determine whether benefits received under FIRA are countervailable, we need to determine whether FIRA benefits may be contingent upon exports and/or whether FIRA is targeted to a "specific enterprise or industry, or group of enterprises or industries" within Mexico as specified in section 771(5)(B) of the Act.
>
> In our 'Final Negative Countervailing Duty Determination: Fresh Asparagus from Mexico' (48 F.R. 21618), we stated that the agricultural sector constitutes more than a single group of industries within the meaning of the Act. According to information from the Mexican government, it appears that FIRA is available to a broad range of agricultural products, and possibly even for some non-agricultural enterprises. If this is the case, FIRA would not be countervailable based on our reasoning in *Fresh Asparagus*. Further, it does not appear that the Florex loan is targeted for exports. However, more information is needed on this program, because it is not

clear from the response exactly what types of products are eligible to receive FIRA financing.

49 Fed.Reg. at 4023–24.

ITA preliminarily determined that all other programs which it investigated did not confer bounties or grants or were not used by producers or exporters of cut flowers. *Id.* at 4024–25.

Commerce then verified the following facts regarding the FIRA program in general. The purpose of FIRA is to develop and support agriculture in Mexico and most support is to the small agricultural producer. A.R. Doc. 74 at 2. Of all credit granted by FIRA, 80.8% went to producers of basic food products and livestock (including grains, fruits, tomatoes, chilis, onions, lettuce, carrots, potatoes, beans, milk, meat, pork, cold cuts, sugar, oil, lard, corn, wheat, rice, eggs, cotton, honey, livestock, and bread), to fill the agricultural needs of the Mexican people. A.R. Doc. 74 at 2–3. The program for low income producers (i.e., peasant farmers who have not yet reached the basic subsistence level and who generally have no other source of income besides agricultural production) is the most important for FIRA. 33.9% of FIRA financing went to low income producers; smaller amounts went to producers in other income categories. A.R. Doc. 74 at 3–4.

In addition to support for basic foods, FIRA provides support for fishing and forestry industries, producers of agricultural tools, feed, and a variety of processed and canned products. A.R. Doc. 74 at 2. Only 8.6% of FIRA credit was used to finance exports. A.R. Doc. 74 at 3. All growers of flowers for export are in the highest income category under FIRA; this category received the smallest percentage of FIRA financing. A.R. Doc. 74 at 7. Of the producers and exporters of cut flowers subject to the Commerce investigation, only one company, Florex, received a FIRA loan during the period of investigation.[2] A.R. Doc. 74.

1. Both "domestic" subsidies and subsidies given upon exportation may warrant the imposition of countervailing duties.

2. Prior to the hearing before ITA, and in their pre-hearing brief, petitioners argued that the Ornamental Horticulture Section of FIRA had provided "significant amounts of credit" to pro-

With regard to Florex, ITA verified that: In May of 1983, Florex received a FIRA loan of 70 million pesos to enable it to acquire another corporation. A.R. Doc. 74 at 9. The interest rate on the loan to Florex was approximately 60 percent because of FIRA participation; absent FIRA participation, funding would have been at a higher rate. A.R. Doc. 74 at 9–10. *See also* A.R. Exhibit 7.

On April 16, 1984, Commerce published its *Final Determination*. ITA determined that 16 programs, either alleged by petitioners to confer bounties or grants or investigated as announced in the initiation, either were not used by Mexican flower growers or were suspended. Regarding FIRA, Commerce determined that its

> main objective ... is to develop Mexico's agricultural sector. To meet this objective FIRA provides short- and long-term financing, loan guarantees, and technical support to firms involved in agricultural production. The Fund for Agricultural Finance (FEFA) and the Fund for Technical Assistance and Guarantee for Agriculture Credit (FEGA) are two of the principal funds which operate under FIRA. FEFA was created in August of 1965 and provides investment funding to producers. FEGA was created in December of 1972 and guarantees credits granted to low-income growers. FEGA also reimburses banks for technical services provided through the banks to growers. Two FIRA loans were outstanding during the period of investigation to cut flower producers exporting to the United States.

> FIRA does not confer an export bounty or grant because it does not operate, and is not intended, to stimulate export over domestic sales. Furthermore, it is not offered contingent upon export performance. In fact, most of FIRA's financing is given to producers who do not export. For FIRA to be considered a domestic bounty or grant, it must be

> "provided or required by government action to a specific enterprise or industry, or group of enterprises or industries" within Mexico as specified in section 771(5)(B) of the Act. In our *Final Negative Countervailing Duty Determination; Fresh Asparagus from Mexico* (48 F.R. 21618), we stated that the agricultural sector constitutes more than a single group of industries within the meaning of the Act. We reaffirm that decision made in *Fresh Asparagus*. Agriculture is more than a specific industry or group of industries. Producers of a wide variety of products including fruits and vegetables, livestock, grains, meat product, milk, and eggs are eligible for FIRA financing. Producers of agricultural tools may also receive financing under FIRA. FIRA loans are also provided to the fishing and the forestry industries. Approximately one-third of Mexico's labor force is employed in agriculture. The FIRA program is generally available to, and used by, wide ranging and diverse industries that constitute a substantial portion of the Mexican economy. There is no evidence that producers or exporters of cut flowers subject to this investigation are a major beneficiary of FIRA. In addition, FIRA is not targeted to any specific region in Mexico.

> Accordingly, we determine that FIRA does not confer a bounty or grant on the production or exportation of Mexican fresh cut flowers, because FIRA loans are not targeted to exports, nor are they given to a "specific enterprise or industry, or group of enterprises or industries" within Mexico as specified in section 771(5)(B) of the Act.

*Final Determination* at 15008. ITA also stated that "even if we had determined that FIRA benefits were countervailable, the loans to the flower producers would confer a *de minimis* benefit." *Final Determination* at 15011.

Following the final determination, plain-

---

ducers and exporters of fresh cut flowers in Mexico. A.R. Doc. 55 at 1–2. Florex is a major

exporter.

tiff Roses, Inc. commenced this action.[3] Defendant now agrees that if the program is countervailable, a reexamination must be made of the issues of the proper benchmark standard for determining whether the loans were made other than on a commercially acceptable basis and other issues relating to the quantification of the benefit bestowed. *See* Transcript of May 1, 1990 Oral Argument (TR) at 68. Because of ITA's non-countervailable ruling these issues were not addressed in depth. Thus, the court will not address such issues at this time.

## DISCUSSION

### I. The Countervailing Duty Law.

As indicated, *supra*, at 871, the underlying petition in this matter was brought under section 303 of the Act.

According to that section:

Except in the case of an article or merchandise which is the product of a country under the Agreement (within the meaning of section 1671(b) of this title),[4] whenever any country, dependency, colony, province, or other political subdivision of government, person, partnership, association, cartel, or corporation, shall pay or bestow, directly or indirectly, any bounty or grant upon the manufacture or production or export of any article or merchandise manufactured or produced in such country, dependency, colony, province, or other political subdivision of government, then upon the importation of such article or merchandise into the United States, whether the same shall be imposed directly from the country of production or otherwise, and whether such article or merchandise is imported in the same condition as when exported from the country of production or has been changed in condition by remanufacture

or otherwise, there shall be levied and paid, in all such cases, in addition to any duties otherwise imposed, a duty equal to the net amount of such bounty or grant, however the same be paid or bestowed.

19 U.S.C. § 1303(a)(1) (1982).[5]

According to section 771(5) of the Act, as amended, 19 U.S.C. § 1677(5) (1982):

The term "subsidy" has the same meaning as the term "bounty or grant" as that term is used in section 1303 of this title, and includes, but is not limited to, the following:

(A) Any export subsidy described in Annex A to the Agreement (relating to illustrative list of export subsidies),

(B) The following domestic subsidies, *if provided or required by government action to a specific enterprise or industry, or group of enterprises or industries,* whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

(i) The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations....

[Emphasis added].

Section 303 of the Act does not define "bounty or grant." The parties originally disagreed as to whether the statutory language emphasized by the court, *supra*, was included in the definition of "subsidies" for the purposes of both section 303 and Title VII, or whether the underscored language modified an already complete definition of "subsidies" for the purposes of Title VII only. The court addressed this issue in *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 235, 564 F.Supp. 834, 839 (1983) and found no differences between

---

3. The other plaintiffs were added by order of November 14, 1988, per Rao, J.

4. 19 U.S.C. § 1671(b) (1982) defines a country under the Agreement. At the time of this investigation Mexico was not a country under the agreement because it had not acceded to the GATT agreement covering subsidies, or to any similar agreement.

5. Unlike actions brought under Title VII, section 701 of the Act, codified at 19 U.S.C. § 1671 (1982), actions brought under 19 U.S.C. § 1303 do not require a determination by the International Trade Commission of injury or threat of injury to a United States industry.

the two provisions.[6] It appears settled in this court that Congress meant the underscored language to be part of the definition of "subsidies" generally and not simply to modify that concept for countries under the Agreement, i.e., those entitled to an injury determination. *PPG Industries, Inc. v. United States*, 11 CIT 344, 350, 662 F.Supp. 258, 264 (1987), *appeal pending* No. 88-1175 (CAFC).[7, 8]

ITA interprets the word "specific" in the underscored language as modifying both "enterprise or industry" and "group of enterprises or industries." It is unclear whether plaintiffs believe the word "specific" modifies "enterprise or industry," only. Presumably, they believe that Congress used the term "group of enterprises or industries" for the same reason that it used other broadening language in section 771(5), that is, to make sure that the statute had the widest possible scope. Such was the suggestion of the court in *Bethlehem Steel Corp. v. United States*, 7 CIT 339, 590 F.Supp. 1237 (1984).[9] In any case, plaintiffs disagree with the implications ITA has drawn from its construction. Neither *PPG* nor *Carlisle* directly disposes of the sentence construction issue, although they do so by implication. That is, they accept that specificity of some type is required. *PPG Industries*, 11 CIT at 350, 662 F.Supp. at 264; *Carlisle*, 5 CIT at 233, 564 F.Supp. at 838. The court remains of this view.

At the time of the investigation in this matter, Commerce adhered to a "general availability" rule,[10] by which ITA determined that benefits available to all enterprises or industries, or even to a large number of them, were not countervailable. This rule evolved from administrative interpretation of the phrase, discussed *supra*, "specific enterprise or industry, or group of enterprises or industries," and was adopted, at least in part, by the court in *Carlisle*. The court rejected a broad application of such a rule in *Bethlehem*, in *dicta*, and subsequently in *Agrexco, Agricultural Export Co., Ltd. v. United States*, 9 CIT 40, 604 F.Supp. 1238 (1985).[11] The court definitively rejected the "general availability" rule as applied by Commerce in *Cabot Corp. v. United States*, 9 CIT 489, 620 F.Supp. 722 (1985) (*Cabot I*), *appeal dismissed*, 788 F.2d 1539 (Fed.Cir.1986). *See also Cabot Corp. v. United States*, 12 CIT ——, 694 F.Supp. 949 (1988) (*Cabot II*).

In the underlying investigation in *Cabot*, ITA determined that the Mexican government was providing carbon black feedstock, an ingredient in the production of carbon black which is used in the production of rubber and other products, to Mexican companies at subsidized prices. ITA determined, however, that this did not constitute a "bounty or grant" because this program was generally available to any Mexican enterprise. 9 CIT at 494, 620

---

**6.** In *Carlisle,* the court held that two accelerated depreciation programs under the corporation tax law of the Republic of Korea were not countervailable since they were generally available to all Korean industries. *Carlisle,* 5 CIT at 232–35, 564 F.Supp. at 838–39.

**7.** *See also PPG Industries, Inc. v. United States,* 13 CIT ——, 712 F.Supp. 195 (1989).

**8.** At oral argument on May 1, 1990, plaintiffs confirmed that they are not pressing the contrary view. TR at 107–08.

**9.** In *Bethlehem,* as in *Carlisle,* the court held that generally available tax benefits, such as a deduction for employee training under the South African tax law, are not countervailable. The court's discussion on the countervailability of other hypothetical "generally available" programs is *dicta.* As the *Bethlehem* court stated,

"[t]he result reached in this decision is in harmony with the result reached in *Carlisle...*." 7 CIT at 349, 590 F.Supp. at 1246.

**10.** "General availability means that what is available is accessible to all who are similarly situated." *United States Steel Corp. v. United States,* 5 CIT 245, 255, 566 F.Supp. 1529, 1537 (1983).

**11.** In remanding the investigation to ITA, the *Agrexco* court held, *inter alia,* that while benefits conferred by government research and development have not been found to be subsidies when "provided for a wide range of disciplines and projects," the mere fact that the results of the research are "disseminated to all growers and to the general public" does not mean that no subsidy exists if "the research and development is targeted to the production of roses." 9 CIT at 43, 604 F.Supp. at 1241–42.

F.Supp. at 728–29. The court held, however, that while carbon black, in principle, was available to any Mexican industry at subsidized prices, it was in fact used by only one industry. The court stated that:

> Since the enactment of section 1303 courts have recognized that they must examine the actual results or effects of assistance provided by foreign governments and not the purposes or intentions.... Nor is section 1303 concerned with the nominal availability of a governmental program. The question is what aid or advantage has actually been received "regardless of whatever name or in whatever manner or form or for whatever purpose" the aid was provided.

9 CIT at 495, 620 F.Supp. at 730 [Citations omitted]. The court held that the "general availability" test was inappropriate and directed Commerce to apply a test which considered the program's actual effect. *Id.* According to the court,

> [t]he distinction that has evaded the ITA is that not all so-called generally available benefits are alike—some are benefits accruing generally to all citizens, while others are benefits that when actually conferred accrue to specific individuals or classes. Thus, while it is true that a generalized benefit provided by government, such as national defense, education or infrastructure, is not a countervailable bounty or grant, a generally available benefit—one that may be obtained by any and all enterprises or industries—may nevertheless accrue to specific recipients. General benefits are not conferred upon any specific individuals or classes, while generally *available* benefits, when actually bestowed, may constitute specific grants conferred upon specific identifiable entities, which would be subject to countervailing duties.

**12.** *See also Cabot II,* 12 CIT at ——, 694 F.Supp. at 950 ("As was held in the *Cabot I* and *PPG* decisions, 'general availability' is not the prevailing standard under 19 U.S.C. §§ 1303 and 1677(5) (1982).")

**13.** *But see Armco Inc., v. United States,* 14 CIT ——, 733 F.Supp. 1514 (1990) (remanded for reconsideration; accelerated depreciation available to all industries in Malaysia was not non-

*Id.* at 497, 620 F.Supp. at 731. [Emphasis in original]. The court went on to say that:

> The appropriate standard focuses on the *de facto* case by case effect of benefits provided to recipients rather than on the nominal availability of benefits. ... The definition of 'bounty or grant' under section 1303 as intended by Congress remains as it is embodied in the case law and later affirmed by Congress in section 1677(5). This definition requires focusing only on whether a benefit has been actually conferred on a 'specific enterprise or industry, or group of enterprises or industries.'

*Id.* at 498, 620 F.Supp. at 732.[12]

The above quoted passages, while general in tone, should not be read in support of the proposition that any benefit not "traditionally" provided by governments or all benefits directed specifically towards the business community are countervailable. *See PPG Industries, Inc. v. United States, supra.* (Neither a government program which allowed all Mexican firms that incurred foreign debt within a certain time frame to purchase dollars at a controlled rate, nor a program that allowed all Mexican enterprises to purchase natural gas at a published price, which was below that at which Mexico sold it for export, was countervailable, because neither program benefitted a specific enterprise or industry, or group of enterprises or industries).[13]

The rationale of *Cabot I* has been codified by Congress in a "Special rule" added in the Omnibus Trade and Competitiveness Act of 1988. *See* House Committee on Ways and Means, Trade and International Economic Policy Reform Act of 1987, H.Rep. No. 40(I), 100th Cong., 1st Sess. 123 (1987) (to accompany H.R. 3).[14] The added section states:

countervailable merely because of its general availability). The *Armco* case relied on *Cabot I,* but did not discuss *PPG* and its progeny. A decision following remand has not been issued, so the final outcome is unknown.

**14.** Much of the Omnibus Trade and Competitiveness Act of 1988 is derived from H.R. 3, a predecessor bill vetoed by the President. *See* 1988 U.S.Code Cong. & Admin.News 1547.

In applying subparagraph (A), the administering authority, in each investigation, shall determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries. Nominal general availability, under the terms of the law, regulation, program, or rule establishing a bounty, grant, or subsidy, of the benefits thereunder is not a basis for determining that the bounty, grant, or subsidy is not, or has not been, in fact provided to a specific enterprise or industry, or group thereof.

19 U.S.C. § 1677(5)(B) (1988).

The House Report makes clear that Congress intended merely to clarify the law, not to change it with the addition of the special rule. H.Rep. No. 40(I) at 123–24.[15] Moreover, the Report states that

> [t]he Court in *Cabot* provided a sound interpretive rule to be applied in those cases where broadly available benefits are at issue. *The test for such programs is whether there is a sufficient degree of competitive advantage in international commerce being bestowed upon a discrete class of beneficiaries that would not exist but for government action.* This necessarily involves subjective, case-by-case decisions to determine whether there is such a discrete class of beneficiaries. This advantage distinguishes general benefits (such as national defense or public education) from benefits that are properly countervailed.
>
> There are, for example, instances where a government provides an input product, such as a natural resource, to its industries in a manner that as actually conferred benefits a specific enter-

prise, industry, or group thereof. For example, if a government restricts access to a product such as natural gas and offers it for consumption at prices below free market rates, an artificial competitive advantage is provided to the consuming industries and such practice could be countervailable. *On the other hand, if the resource is freely available on a nondiscriminatory basis to all purchasers within a country without government restriction, such as Venezuelan natural gas, then a countervailable subsidy is not likely to exist.*

H. Report No. 40(I) at 124. [Emphasis added].

Congress has stated expressly that *Cabot* evinced what had always been the legislative intent behind section 303 of the Act. The court notes that while

> [i]t is true that the views of a subsequent Congress cannot override the unmistakable intent of the enacting one ... and form a hazardous basis for inferring the intent of an earlier one.... [s]uch views are entitled to some weight, particularly when the precise intent of the enacting Congress is obscure.

*Carlisle Tire and Rubber Co. v. United States,* 5 CIT 229, 235, 564 F.Supp. 834, 839 (1983). [Citations omitted]. It is now generally accepted in this court that

> 'general availability is not the statutory test. It is merely one of several relevant factors to be considered in determining whether or not a benefit or competitive advantage has been conferred upon a "specific enterprise or industry, or group of enterprises or industries."'

> (13) *Determination of Subsidies.*—The Committee bill adds a special rule to the definition of a subsidy under current law to *clarify* that the Commerce Department must determine whether a bounty[,] grant, or subsidy in fact is provided to a specific industry rather than finding a nominal availability of the subsidy to all industries as a basis for determining that the subsidy is not provided to a specific industry.

[Emphasis added].

---

**15.** *See also* H.R.Conf.Rep. No. 576, 100th Cong., 2d Sess. 587, *reprinted in* 1988 U.S.Code Cong. & Admin.News 1547, 1620, which states that "[t]he House bill *clarifies* the application of the countervailing duty law to domestic subsidies by requiring that the Commerce Department base its determination on whether a particular subsidy is in fact bestowed upon a specific industry or group of industries or instead is bestowed upon industries in general." [Emphasis added].

Senate Committee on Finance, Omnibus Trade Act of 1987, S.Rep. No. 71, 100th Cong., 1st Sess. 19 (1987) (to accompany S. 490) states:

*Comeau Seafoods Ltd. v. United States,* 13 CIT ——, 724 F.Supp. 1407, 1414 (1989) (*quoting Alberta Pork Producers' Mktg. Bd. v. United States,* 11 CIT 563, 567, 669 F.Supp. 445, 450 (1987) (*quoting PPG,* 11 CIT at 352, 662 F.Supp. at 265)). In *Alberta Pork,* the court upheld ITA's determination that Canadian hog growers received countervailable benefits. Plaintiffs in that case argued that these benefits could "potentially be disbursed toward an even greater range of products...." 11 CIT at 468, 669 F.Supp. at 451. The court, however, found that

> [w]hile general availability is a relevant factor in determining whether benefits are countervailable under Section 1677(5)(B), *see PPG Industries, supra,* the [program] discriminates between commodities by providing pre-authorized, regular payments to producers of [certain] commodities, while offering unpredictable benefits to others who may apply for designation under the [program].

*Id.*

In *Comeau Seafoods, supra,* the court upheld ITA's determination that Canadian ground fish producers received countervailable benefits through the Canadian Economic and Regional Development Agreements program, which was "implemented through subsidiary agreements between the federal and individual provincial governments." 13 CIT at ——, 724 F.Supp. at 1415. Plaintiffs there claimed that ITA erred in examining a specific agreement rather than the entire national program. The court, however, found that

> [w]here the terms of [a] program do not appear to be limited to a specific group of enterprises or industries, it may still be countervailable if its benefits are, in practice, bestowed upon a specific group of enterprises or industries.

*Id.* (*quoting IPSCO, Inc. v. United States,* 12 CIT ——, 687 F.Supp. 614, 632 (1988) (*citing PPG,* 11 CIT at 352, 662 F.Supp. at 265)).

In *Can–Am Corp. v. United States,* 11 CIT 424, 664 F.Supp. 1444 (1987), the court gave a clear explanation of its interpretation of the countervailing duty law. In

that case, plaintiffs claimed that, under *Cabot,* Mexican lime producers received countervailable benefits through a program that provided all Mexican enterprises with oil at prices below what it was sold for in export. The court, however, found

> that plaintiffs' interpretation of the test prescribed in *Cabot* for determining a domestic bounty or grant under section 1303 is in error. In *PPG Industries v. United States,* [11 CIT 344, 662 F.Supp. 258 (1987)], Judge Carman who decided *Cabot* confronted a similar claim involving the provision of natural gas to the Mexican float glass industry. The plaintiffs in *PPG Industries* argued that the provision of natural gas at far below world market prices conferred a countervailable benefit because such price differential resulted in an enormous cost advantage to Mexican float glass producers and exporters vis-a-vis producers and exporters in other countries. *PPG Industries,* [11 CIT at 361, 662 F.Supp. at 272].

The *PPG Industries* Court first explained that section 1303 which employs the phrase 'bounty or grant' provides the substantive law where, as in this case, the country involved in the investigation is not a 'country under the Agreement' within the meaning of section 701(b) of the Act, as amended, 19 U.S.C. § 1671(b) (1982). The court concluded, however, that Commerce, as it did in this case, may rely upon the general countervailing duty provisions of section 701 of the Act, as amended, 19 U.S.C. § 1671, governing investigations of countries under the Agreement within the meaning of section 1671(b), which employs the term 'subsidy' defined in section 771(5) of the Act, as amended, 19 U.S.C. § 1677(5) (1982) because the two provisions are legally interchangeable. *PPG Industries,* at [350–51, 662 F.Supp. at 264].

The *PPG Industries* Court accepted Commerce's finding that 'the existence of a price differential between export and domestic sales of natural gas, or between domestic and "world market" prices does not, in and of itself, confer a bounty or grant,' stating that 'it is well established that the mere existence of a

price differential between exported and domestic prices, does not in and of itself confer a bounty or grant under § 1303.' *PPG Industries*, at [362, 662 F.Supp. at 272] (citing *United States v. Zenith Radio Corp.*, 64 CCPA 130, 138, C.A.D. 1195, 562 F.2d 1209, 1216 (Fed.Cir.1977), *aff'd*, 437 U.S. 443 [98 S.Ct. 2441, 57 L.Ed.2d 337,] (1978) for its proposition that 'Congress has not statutorily required that every governmental action distinguishing between products consumed at home and those exported shall be deemed the bestowing of a bounty or grant'). The court stated that the appropriate standard or test requires Commerce to conduct a *de facto* case by case analysis to determine whether or not a program provides a 'subsidy' or a 'bounty or grant' to a 'specific enterprise or industry, or group of enterprises or industries.' The *PPG Industries* Court held that Commerce properly refused to countervail against the natural gas pricing program since the float glass companies under investigation paid the published price for natural gas and the gas was actually available to all Mexican industries at that price.

11 CIT at 427–28, 664 F.Supp. at 1148.[16]

II. The Countervailing Duty Law with Regard to Domestic Subsidies Applied to this Investigation.

As explained, "[d]ecisions of this court require Commerce to conduct a *de facto* case by case analysis to determine whether a program provides a subsidy, or a bounty or grant, to 'a specific enterprise or industry or group of enterprises or industries ...'" *Saudi Iron and Steel Co. (Hadeed) v. United States*, 11 CIT 880, 884, 675 F.Supp. 1362, 1367 (1987) (*citing, inter alia, PPG*).

 Therefore, the appropriate test in the current investigation should have been whether a competitive advantage *in fact* was bestowed on a specific enterprise or industry, or a group thereof, by the program at issue. Thus, the general availability rule under which ITA conducted the investigation was flawed. This would not in and of itself require a remand were the court convinced that the application of a flawed legal test had led to harmless error. In this case, however, the court believes that further consideration by ITA is required.

Because ITA did not apply the proper standard the dispute in this case boils down to the question of whether a determination that flower growers did not receive loans that were part of a program targeted to a specific enterprise or industry, or group of enterprises or industries, is the only fair conclusion from this record.[17] If more than one conclusion may be drawn from the record the agency must reconsider its decision under the proper legal standard.

The FIRA program differs from the Mexican natural gas program in *PPG* and the Venezuelan natural gas program described in the House Report. Those programs provided a natural resource at subsidized prices to all enterprises and industries in their respective economies on a nondiscriminatory basis. FIRA, on the other hand, provided loans only to the agricultural sector which, though large, is still a discrete and possibly shrinking part of the Mexican economy.

The limited number of enterprises which could apply for FIRA loans may make the program somewhat more similar to the FICORCA program found to be noncountervailable in *PPG*. The FICORCA program, however, offered dollars at a fixed rate to all enterprises which had incurred foreign debt within a certain time period. The qualifying enterprises were probably whol-

---

16. *See also Al Tech Specialty Steel Corp. v. United States*, 11 CIT 372, 380, 661 F.Supp. 1206, 1213 (1987) (benefits of Spanish bankruptcy law, available to all Spanish enterprises, are not countervailable because they are not given to "a discrete class of beneficiaries") (*citing PPG*, 11 CIT at 353, 662 F.Supp. at 266).

17. The substantial evidence standard is relevant if the agency is applying the law correctly. The court will uphold a determination of ITA with regard to the unfair trade law unless the decision is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

ly unrelated. Moreover, it appears that there was no discretion allowed to Mexican government officials in providing benefits under the FICORCA program. Any Mexican enterprise with foreign debt during the relevant time period had the right to purchase dollars at a published price. FIRA, on the other hand, seems discretionary by its nature. The FIRA loan at issue here was made to allow Florex to purchase the assets of another flower company ostensibly to protect local jobs. Such a loan program appears different in kind from programs that supply resources to enterprises on a clear nondiscretionary basis. Other evidence in the record also indicates that the Mexican government considers certain types of projects for FIRA financing on a case by case basis. A.R. Doc. 28, attachment "Que es Fira", at 7–9.

Furthermore, the record indicates that historically, growers of cut flowers received little help from FIRA, but that this pattern changed with the creation of a new section in the program's administration.

> As a result of the promotions carried out by different organizations for the development of commercial species producing cut flowers, ornamental plants and foliage, together with the quantity of important applications of credit that were received in the Technical Offices of the FIRA, ... the Directive (sic) of the FIRA considered it convenient to approve the creation of the Section of Ornamental Horticulture on March 28, 1977 ...

Report of the Bank of Mexico on the Participation of FIRA in Support of the Ornamental Horticulture. A.R. Doc. 1, Exhibit 1, at 54. The record indicates that the creation of the new section was motivated by policy concerns of the Mexican government.

> As was mentioned previously, the ornamental horticulture in our country is limited, principally due to the fact that the production obtained is destined to the national market. Nonetheless, there exist (sic) the security that with the adequate management of the existing natu-

ral resources, the employment of advanced techniques in the production and the efficient commercialization, this activity may become an important one, especially in the exportation field; one cannot forget the proximity of the American market, which is a large consumer of flowers and plants for ornament, mostly supplied by Colombia.

*Id.* at 43. The report goes on to say that [t]he principal objective in the Section of Ornamental Horticulture is: promote and improve the production of ornamental plants, fresh flowers and foliage, taking advantage of land-climate-water resources, for the creation of permanent sources of employment in the rural environment and for the *acquisition of foreign currency.*

*Id.* at 54. [Emphasis added].

Presently, the negative *export* subsidy determination of ITA regarding FIRA is not challenged. Nonetheless, the effect of the FIRA program on international commerce should be considered in making the domestic subsidy determination. *See* H.R. Report No. 40(I) at 124.

Apparently, Commerce focused on FIRA as a whole rather than on the Section for ornamental horticulture. Defendant-intervenor claims that this was reasonable because the creation of the section was "nothing more than administrative convenience and [did] not in any way affect the general availability and non preferential nature of the program." *Intervenor's Response and Opposition to Plaintiff's Motion for Review upon the Agency Record* at 15. As discussed, *supra*, ITA's previous general availability test is flawed, and "administrative convenience" here seems rather to reflect the governmental discretion involved in FIRA, with different administrative sections operating pursuant to different policy goals.[18] Programs bestowing benefits on different enterprises or industries for different policy reasons should not escape countervailability simply because the programs are loosely grouped under one heading, here FIRA.

---

**18.** The court does not mean to imply that the intent of the government is the controlling factor. It is the actual functioning of the program which controls.

Finally, ITA's present investigation differs from that in *Final Negative Countervailing Duty Determination; Fresh Asparagus From Mexico,* 48 Fed.Reg. 21618 (1983). In that investigation, Commerce determined that a FIRA program which provided a low cost water for agricultural enterprises in certain areas of Mexico was not countervailable. That program was non-discretionary, at least at the district level, and was not directed to any particular kind of agriculture. *Id.* at 21621.

The court notes that since its original determination here, ITA has developed a "specificity test." Under that test

> [ITA] typically consider[s] three factors when making this determination: (1) the extent to which a foreign government acts (as demonstrated in the language of the relevant enacting legislation and implementing regulations) to limit the availability of a program; (2) the number of enterprises, industries, or groups thereof that actually use a program, which may include the examination of disproportionate or dominant users; and (3) the extent, and manner in which, the government exercises discretion in making the program available.

*Final Affirmative Countervailing Duty Determination and Countervailing Duty Order; Carbon Steel Wire Rod From Malaysia,* 53 Fed.Reg. 13303, 13304 (1988).[19] The appropriateness of this test is not directly before the court, and such a test may or may not answer the concerns raised here, depending on how it is applied. If the test is applied mechanically, it may fail to address the relevant issues. In deciding whether a countervailable domestic subsidy has been provided ITA must always focus on whether an advantage in international commerce has been bestowed on a discrete class of grantees despite nominal availability, program grouping, or the absolute number of grantee companies or "industries."

### CONCLUSIONS

The court remands this case to ITA to make a new determination. ITA is to re-place its flawed "general availability" test with a test which is consistent with the statute and which will determine whether or not the Mexican flower industry, during the period of investigation, received benefits, bestowed on a discrete class, which gave it a comparative advantage in international commerce. ITA shall perform such further investigation as is necessary and shall give the parties an opportunity to comment on its new approach. ITA shall report the results of its determination to the court within ninety days of this order.

SO ORDERED.

---

**19.** This determination underlies the decision to remand in *Armco,* discussed *supra* at n. 13. The court in *Armco* rejected this specificity test.